IN THE MATTER OF THE WILL OF SAMPSON C. BEVER, Deceased, JAMES L. BEVER AND GEORGE BEVER, Proponents and Appellants, v. JANE E. SPANGLER AND ELLEN C. BLAKE, Contestants and Appellees.

**Will Contest: Evidence as to Mental Soundness: JURY QUESTION.** Testator dies at the age of eighty-four, leaving about six hundred and fifty thousand dollars.  He wrote his own will in 1886, being then seventy-eight years old.  At this time, one daughter, Mrs. Spangler, lived in a homestead furnished by her father.  She owned the proceeds of an eight thousand dollar insurance policy upon her husband.  When she rented the homestead her income was about one thousand two hundred dollars a year, otherwise about seven hundred dollars.  Mrs. Blake, another daughter, lived in a homestead furnished by her father and had but a nominal income.  James, a son, was worth about thirty-seven thousand dollars, another son about twenty-eight thousand dollars,

and the circumstances of the third son do not appear. Mrs. Spangler and Mrs. Blake each have three, and the sons no children. Mrs. S. and Mrs. B. were each willed said homesteads and about fifteen thousand dollars and each of the sons about two hundred thousand dollars. All of the children treated deceased well and deceased seemed to regard them alike. The two sons named were drawing salaries and had not been specially instrumental in the accumulation of decedent's property. About the time the will was made, he told one daughter she would get as much as any of the children. On behalf of contestants the testimony tends to show: Before 1872 deceased was a very shrewd and competent business man. In that year a fall confined him to bed for a week or more and, for about a day, he appeared "flighty' or out of his head. From then on he gradually withdrew from active business. Physical weakness appeared and his memory showed signs of failing. For the first time he needlessly exposed himself to inclement weather. In 1882, his son was stricken with fatal illness of short duration. The father, apparently was surprised when death came and had not thought that a nurse was required. Soon after the son's death he became nervous and irritable and began to repeat himself in talking, and would be surprised when told of it. After his wife's death in 1885 he would repeat stories in the same conversation and stare into space vacantly. He would mislay his tickets when on a journey. He asked and was given an address, asked for it again in a few minutes and appeared surprised when told he had it in his pocket. He asked why his son-in-law did not call, when he had been there very recently. In 1884 he hired a house moved, and after the work was done, he denied making any contract. He remembered it after some talk, and he said his head did not feel good. His eyes looked "glarey" on this occasion. In the latter part of 1883 he failed to recognize old friends. His wife's death in 1885 was a severe shock to him, and this failure to recognize friends became frequent after that. He did not recognize his son-in-law when he passed him in the street. Met acquaintance of thirty years' standing and his old bookkeeper without recognition. Would cry upon discovering these lapses of memory. Would talk to his hired man in the morning and fail to recognize him in the afternoon after the man spoke to him. He would frequently ask who passers-by were and would repeat this when they passed again. When told of this he said: "It is strange I can't remember." He knew his daughter had a cottage in Clear Lake. She was present when he arrived there in 1891, but he asked who lived there. Was driven to his son's house by the son and, on arriving, asked whose it was and where he was. He called to see a dead connection of the family, to whom he had been attentive in illness, pushed aside the coverings and asked who it was, and left without saying more

or replacing the draperies. Would often call up subjects in vestry meetings that had been disposed of. He forgot his wife's death, recollecting it later. Forgot the relationship old friends bore to one another. In 1887 he asked an acquaintance whom he met on the street of his residence where Bever's house was, and had the appearance of being lost. In 1890 he inquired for an office with which he was familiar, being then within a block and a half of it. In 1884 he repeatedly called on the township clerk about an increase in taxes and seemed bewildered when told that the matter had been explained to him before. Seemed to act childish and forgetful, to be dazed and confused and not to remember having been in the office before. In 1888 he called on the county treasurer, put some papers into his own pocket and thought he had given them to the treasurer. In 1890 he called on a friend who had been buried in Cedar Rapids, failed to recognize the friend's daughter, was told of the friends's death, seemed shocked at it and forgot it again. He had a childish expression then. He failed to recognize old friends upon whom he called, and fell asleep during the call. In 1888 he began to complain of his poverty. In 1884 he repeatedly complained to the township clerk about a small increase in road tax and said, with tears, that he was unable to pay it, and that if the clerk paid the tax and took the land for it, it would result in financial disaster. He had always been attentive and sought the best accommodations for his wife when traveling. On a trip taken with her about this time he was irritable, nervous, excitable, forgetful and often confused. He hurried from place to place without regard to her feebleness and compelled her once to lie all day on the lounge of a hotel parlor; said that he did not feel able to stay at the best hotels. Before 1885 he began collecting things of no value and bringing them home. His wife sent them away and he did not notice their disappearance. In the latter part of 1883 he would begin sentences, break off abruptly and appear confused and dazed. In 1888 he had disjointed talks with his hired man. Soon after his son's death his mouth would frequently be open when he was not talking. In 1883 his eyes began to have a vacant look. In 1887 his face had a look of vacancy or lack of intelligence. It showed an absence of the vivacity of former years. He kept his mouth open part of the time. In 1882 he would, covering a considerable period, make visits to the office of his son-in-law, say nothing, aimlessly pick up papers, stare round the room and go out. In 1888 the county treasurer offered him his tax receipts after he had attended to his taxes in the company of his son-in-law and he declined them, saying he would have to see his son about it. He put in a whole afternoon having a chattel mortgage drawn about which there was no difficulty or controversy. In 1890 he went into a harness shop for a watch-guard and into a dry goods store

for liquor, and demanded rent of a stranger in a place where he had no tenants. In 1888 he talked in a childish manner to his cow, and muttered much to himself.

On the other hand, many, more or less familiar with deceased, testified to various business and social transactions of his and that they never discovered any evidence of unsoundness; and there is undisputed evidence that he attended to matters of private business, making leases, contracts, selling property, and upon business and religious meetings as a man possessed of all his mental faculties. Much of this came from those who met decedent simply in a business way, while most of that for contestants came from those in his home, and who were with him daily. Proponents did not testify as to his actions and they failed to offer a codicil made in 1891. *Held*, the question of decedent's capacity to make said will was for the jury, and its finding that he was not so capable will stand. It would have been error to direct a verdict for proponents. A verdict the other way would not have been interfered with on appeal, and some of the members of the court would have much preferred such a verdict. *Bennett v. Hibbert*, 88 Iowa, 154, and *Denning v. Butcher*, 91 Iowa, 425, *distinguished*. SAME. Where the jury makes a finding upon conflicting evidence, and the trial judge sustains it on motion for new trial, the finding will not be disturbed on appeal unless it is clearly, not doubtfully, against the manifest justice of the case.

**Weight of Evidence:** INTEREST. While interest bears against a witness, yet, where the question is whether lapses of memory and the like are due to old age or dementia, those who are best acquainted with decedent, by reason of having been close to him, while apt to be interested, can, aside from that interest, furnish the most satisfactory testimony.

PROXIMATENESS. Where a mental disease is progressive and of long standing (senile dementia), testimony on mental condition covering a connected period of six years *after* the making of the will, is not too remote.

BURDEN OF PROOF. Where general mental unsoundness is shown, the burden is on proponents to show that the will was made when the testator was of sound mind. *Blake v. Bourke*, 74 Iowa, 522, *distinguished*.

DECLARATIONS OF TESTATOR as to his testamentary intentions and the condition of his mind and memory are admissible either as *res gestae* or on the state of his mind and affections; especially when undue influence is in issue.

EXPERT WITNESSES were superintendents of insane hospitals and others who had large experience with the insane. *Held*, that while expert testimony has its infirmities, it is admissible and its

23 weight for the jury; also that it may be of great value in diseases
like senile dementia. Rule applied where expert opinions on
mental condition conflicted, and lay witnesses showed the compe-
24 tent transaction of business.

SAME: WEIGHT. The evidence of experts who knew and had treated
29 the testator is not, as matter of law, of greater weight than that
of others who base opinion on hypothetical questions.

HYPOTHETICAL QUESTIONS may embrace matter of itself immaterial
19 and irrelevant if it form part of testator's history, and if proper,
in connection with other circumstances, to be considered as show-
ing his condition of mind.

SAME. It is not essential that they state facts as they exist. They
18 may assume the facts according with the questioner's theory.
And it is but necessary that the evidence shall *tend* to prove the
facts so assumed.

CROSS-EXAMINATION. Experts may be cross-examined on purely
26 imaginary and abstract questions or assumed facts and theories
not in evidence, in the sound discretion of the court.

OPINIONS OF NON-EXPERTS. Such a witness may testify to his conclu-
31 sions where the matter in testimony cannot be reproduced or
described to the jury precisely as it appeared to the witness at
the time. He may say as to the condition of a person's health,
and that he is ill or disabled or has a fever or is destitute, or
whether a person was intoxicated at a given time.

**Instruction Construed.** A charge to weigh all the evidence, including
27 that of experts, and find against the will if satisfied by the evi-
dence that testator suffered from senile dementia and that it so
affected his mind when making his will that he could not recol-
lect his property, etc., does not direct that weight shall be given to
the experts, although some of the assumed facts stated to them in
28 hypothetical questions are found not to exist.

**Practice:** OFFERED INSTRUCTIONS. While it is true that the opinions
30 of experts are not entitled to any weight when the hypothesis
stated in them is found to be incorrect in important particulars
or to be partial or unfair, it is not error to refuse so to charge
where the court has told the jury that the value and weight
27 of such opinions is a matter for its determination.

SAME. The rule that the district judge should direct a verdict where
25 it clearly appears that it would be his duty to grant a new trial if
the party having the burden should prevail, has no application to
the granting of new trials by the supreme court.

*Appeal from Linn District· Court.*—HON. JAMES D. GIFFEN, Judge.

TUESDAY, JANUARY 29, 1895.

On the twenty-fifth day of August, 1892, there was filed in the office of the clerk of the District Court of Linn county, Iowa, for probate, a paper purporting to be the last will and testament of Sampson C. Bever, deceased. This paper bears date February 18, 1886, and to it is attached what appears to be a codicil, of date July 27, 1891. These papers are each signed by the maker, and witnessed according to law. A notice of hearing was immediately issued by the clerk of the aforesaid court, fixing the time for the probate of the will on October 10, 1892. On September 27, 1892, the contestants, Jane E. Spangler and Ellen C. Blake, who are daughters of Sampson C. Bever, appeared and filed written objections to the probate of the will, and contested the same on the grounds: First, That at the time of the execution of the will and the codicil Sampson C. Bever was of unsound mind and mentally incapacitated from making a valid will; second, that the alleged will and codicil were each procured and executed by fraud, duress, and undue influence of James L. and George W. Bever. After these objections were entered, the proponents filed a withdrawal of the codicil, and a renunciation of all claim thereunder, and asked that the original will only be admitted to probate. The proceeding on the issues thus formed came on for hearing to a jury, at the January term of the Linn District Court, and, after a trial lasting more than four weeks, the jury returned a verdict that the paper presented for probate was not the valid will of Sampson C. Bever, deceased, and especially found that the will was not the result of fraud or undue influence, but did

find that the deceased did not on February 18, 1886, have sufficient capacity to make a will. Proponents moved for a judgment on the special findings in their favor, and for a new trial as to the other issues. This motion was overruled, and judgment was entered denying admission to probate of the instrument filed, and alleged to be the last will and testament of Sampson C. Bever, and the proponents appeal.—*Affirmed.*

*J. W. Jamison* and *Charles A. Clark* for appellants.

*W. G. Thompson, Chas. E. Wheeler, Mills & Keeler,* and *Hubbard & Dawley* for appellees.

Deemer, J.—Sampson C. Bever, an old and influential resident of the city of Cedar Rapids, died at his home in that city on August 22, 1892. At the time of his death he was eighty-four years of age. He was seventy-eight years old when the paper in controversy, which purports to be his last will and testament, was executed. He left five children surviving him, to-wit, Mrs. Jane E. Spangler, James L. Bever, George W. Bever, Ellen C. Blake, and John B. Bever, named in the order of their ages. His estate at the time of his death consisted of lands, town lots, bank stock, railroad stock, and bonds, and stock in other incorporations, of the aggregate value of about six hundred and fifty thousand dollars. At the time of the execution of the will Mrs. Spangler had no property except her homestead, which her father had built for her, and some eight thousand dollars life insurance, which she received on the death of her husband. Her annual income when her home was not rented, was six hundred dollars to eight hundred dollars, and when it was rented her income was increased to one thousand

one hundred dollars or one thousand two hundred dollars per year. Mrs. Blake occupies a homestead built by her father, and had merely nominal annual income. James L. Bever was worth in his own right about thirty-seven thousand dollars, and George W. Bever about twenty-eight thousand dollars. There is no showing as to what John B. Bever's circumstances were. Mrs. Spangler had one son, James L. Bever had two sons and one daughter, and Mrs. Blake one son and two daughters. The other children of the elder Bever were married, but had no children. By the terms of the will in question, Mrs. Spangler was given her homestead, worth from twenty-five thousand dollars to thirty thousand dollars, and ten thousand dollars of bank stock, worth fifteen thousand dollars. Mrs. Blake was given her homestead, and some other lots, the same amount of bank stock given to Mrs. Spangler, and one thousand dollars in stock of another bank; the aggregate value of the property devised to her being about the same as that given to Mrs. Spangler. The remainder of the estate, after deducting some small bequests, was, by the terms of the will, left to the three sons; James L. to receive about two hundred thousand dollars, and the other sons in the neighborhood of one hundred and seventy-five thousand dollars each. The elder Bever came to Cedar Rapids in the year 1851, bringing with him about thirty thousand dollars in money. He also owned at this time four farms, three of them in Iowa and one in Illinois. One of these farms, consisting of about five hundred and thirty acres, lying near the city of Cedar Rapids, was purchased by Bever in the early fifties for less than four thousand dollars. The other real estate owned by him, except the homesteads of Mrs. Spangler and Mrs. Blake, were purchased about the same time for a few thousand dollars. This real estate, because of its situation

and the natural rise in the value of landed property, was worth at the time of Mr. Bever's death more than half a million dollars. In 1859 or 1860, Mr. Bever, in connection with his son James L., began a private banking business in the city of Cedar Rapids, and in 1864 converted it into a national bank, with the elder Bever owning much the larger part of the stock. After the organization of the national bank, James L. and George W. Bever began investing their savings and doing business for themselves, until, by good management and fair dealing, they had accumulated, in 1886, about fifty-six thousand dollars. James L. Bever was cashier of the bank, and George W. Bever vice president, and as such they drew salaries. We have stated these facts to show how the property of the deceased was accumulated, that we may the better understand the relative obligations he was under to his children. It may further be said in this connection, that all the children treated him with the greatest respect and deference, and each administered to his wants in sickness and in health as best they knew. Mr. Bever was always welcome at the home of any of his children, and received every attention that filial affection would dictate.

He seemed to make no distinction between his children, and always spoke of them in terms of love and endearment.

These preliminary facts are set forth that we may better understand the case and discuss the real issues between the parties, presented to us for determination.

From the preliminary statement preceding this opinion, it will be seen that the jury in the court below found against the contestants on the issue of fraud and undue influence, and in their favor on the issue of unsoundness of mind. The appeal is from this latter

finding; and with the rulings of the court on this issue we will have to deal.

The record is very voluminous, consisting of more than one thousand three hundred pages of printed matter, and a large number of original exhibits which have been certified up for our inspection.   We have given the case the attention its importance demands, and proceed now to take up the errors assigned in the order in which they have been discussed by counsel.

I.   Appellant's counsel strenuously, earnestly and learnedly contend that the verdict finds no sufficient support in the testimony, and that a motion submitted by them at the close of the testimony to direct a verdict sustaining the will should have been sustained.

This appeal does not present the case for trial to this court, *de novo*.   It comes to us on errors, and is to be treated as a law action, and the rules applicable to such cases on the questions thus presented by counsel are well understood.

It has been announced time and again by this court, that a motion for a new trial is addressed to the sound discretion of the court, and such discretion will not be interfered with on appeal, unless it is manifest that it has been improperly exercised.   Where there is a conflict in the testimony, the action of the court below, in overruling a motion for a new trial, will not be disturbed upon appeal unless a clear case of abuse of discretion is made to appear.   We must be fully satisfied that the discretion of the court below has been improperly exercised in refusing a new trial before we will disturb such ruling.

These rules are undoubted.   From the case of *Freeman v. Rich*, 1 Iowa, 504, decided in 1856, down to the present time there has been no departure from these principles.   Under our present system, giving to parties in law actions a right to trial by jury, these

must of necessity be the rules governing appellate courts, else the constitutional guaranty is of no purpose.

If we are to pass upon the real merits of the controversy, and finally determine the case upon the issues presented when there is a conflict in the testimony, then the jury has done no more than take a preliminary step necessary to pass the case to us, in order that we may review the testimony and pass the judgment which we think ought to be rendered. It is perfectly manifest that this is not the purpose of the jury system. The people, in their sovereign capacity, have seen fit to leave the settlement of important questions of fact in law cases to the determination of juries, and, when there is a conflict in the testimony, these jurors are charged with the duty of weighing the testimony presented on either side, and determining which of the conflicting statements shall be believed, and how the controversy shall be settled. Again, the trial judge who passes in review the findings of the jury has the opportunity of seeing the witnesses, and of observing their demeanor while on the stand. He must of necessity keep an ever-watchful eye upon the proceedings, and is much better able to arrive at the real facts in the case than we are; and it is our duty to accept his judgment, and respect his discretion, unless the findings are clearly, not doubtfully, against the manifest justice of the case. These same rules have been applied to contests of this kind: *Seaward v. Carman*, 78 Iowa, 707, 43 N. W. Rep. 542; *Primmer v. Primmer*, 75 Iowa, 415, 39 N. W. Rep. 676; *Duggan v. McBreen*, 78 Iowa, 591, 43 N. W. Rep. 547. In the *Seaward-Carman Case, supra*, we said: "A large number of the personal acquaintances and friends of the deceased were examined as witnesses, and the acts and conversation of the deceased were detailed to the jury.

Some of the witnesses were of opinion that her mind was unsound, and they gave the facts on which they based their belief. Others saw nothing in her walk and conversation to denote mental unsoundness. The medical experts were examined, and their opinions taken upon hypothetical questions, based upon the evidence, and their opinions as to her mental capacity differed widely. All the evidence was submitted to the jury, and after proper deliberation, they found for the contestant. This finding received the sanction of the learned district judge who presided at the trial, and heard and saw the witnesses, and we do not think the case presents that want of support in the evidence which requires this court to interfere. It is true, the jury might have been influenced to some extent by the idea that an equal division of the property between the parties was fair and equitable, and there is much ground for entertaining that belief; but aside from that consideration, and independent of it, in view of the conflict in the evidence, it appears to us to be our duty to sustain the verdict." And in the case of *Duggan v. McBreen*, this language is used: "None of these facts, considered alone, would establish testamentary incapacity, and all of them taken together may not, but we think their weight should have been submitted to the jury for determination."

Let us look now, to the facts testified to by contestants' witnesses upon the trial, which the jury was authorized to believe were true. It is conceded by all parties that prior to the year 1872, Mr. Bever was a very active, sharp, shrewd, and competent business man,—one who had made a success in life, and whose opinion was much sought after and greatly relied upon. Contestants' testimony tends to show, however, that in July of that year, when at the age of sixty-four years,

Mr. Bever fell from a stepladder, on which he was at work, receiving injuries which confined him to his bed for a week or more. In the afternoon of that day, after receiving his injuries, he appeared "flighty" or out of his head, and this was noticed the succeeding day. From this time on he gradually withdrew from active business affairs, and signs of physical weakness began to appear. He began to walk with a cane, and his memory showed signs of failing. He would needlessly expose himself to the inclemency of the weather, which he had not done before. In the year 1882, his son Henry was stricken with a fatal illness, which lasted but a few days. Mr. Bever apparently did not realize the seriousness of the malady, and was surprised when death occurred. He did not think his son ill enough to require a nurse. Soon after Henry's death he began to repeat himself in conversation with the same person. He would visit the office of his son-in-law, aimlessly pick up papers, say nothing, stare around the room, and go out. This was a somewhat frequent occurrence, extending over a considerable period of time. He became nervous and irritable, and would nervously pound the floor with his cane. In the winter of 1882-83 he went to see one of the tenants in the bank building to see about some of the steam-heating fixtures. Would talk with the tenant about them, and the next day come back and go over the same conversation. This occurred several times, and when the tenant told him about his repeating the matter so often Mr. Bever seemed surprised. In 1883 he, with his wife and daughter, went on a trip to Illinois. On this trip he would frequently mislay his railroad tickets, and when he found them would remark that his memory was failing him fast, and that it was a great cross to him. On this trip he visited an old friend, and in the course of the conversation asked

for the address of a certain manufacturer, which was given him, and he put it in his pocket, and within a few minutes said: "You forgot to give me that address," and appeared surprised when he was told that he had it in his pocket. After he found it, he remarked that his memory was getting so he could not recollect anything. In the latter part of 1883 he would at times begin a sentence, and before completing it would break off abruptly, and appear confused and dazed. He would fail to recognize his friends whom he had long known, and his eyes began to have a vacant look. In the year 1884, accompanied by his wife and daughter, he went to Florida, partly on account of the health of his wife. In his travels before, he had been attentive and thoughtful for the welfare of his wife, and always sought the best of accommodations. On this trip he was irritable and forgetful, nervous and excitable, and often confused. He hurried from place to place without considering his wife's feeble condition, and refused at one time to procure a room for her, and she was compelled to lie on a lounge in the parlor of the hotel all day. He complained of the expense of the trip, and said he would have to go home, and that he did not feel able to stop at the best hotels on account of the expense of the trip. He also mislaid his railway tickets on this trip. In 1884 he went four or five times to the office of the township clerk. The first time with reference to a small increase in his road taxes. He seemed very much worried about his taxes, said he did not see how he was going to pay them; that the land was not worth more than the taxes. "He was very much agitated, and when he was talking the tears would come to his eyes, and he felt absolutely that he could not pay it." After he had been in several times about the road taxes, the clerk told him he had already explained the matter to him before, and he seemed

bewildered and surprised, as if he had forgotten about it. After he had been in several times, the clerk offered to take the land and pay the taxes, and Mr. Bever tried to convince him that it would be a mistake, and result in financial disaster. At these times he acted childish and forgetful, seemed dazed and confused, and did not seem to have any memory of being in the office before. Shortly after the death of his son Henry, it was noticed that his mouth was frequently open when not talking. He met people on the street, with whom he was well acquainted, and did not know them. This was prior to 1885. In 1884 he had a house moved, and after the work was done denied that he had any contract with the man who moved it. After some talk he remembered it, and remarked that his head did not feel good. The expression of his eyes at this time was glaring,—"glary looking." Prior to 1885 he had commenced collecting rusty nails, paint cans, and articles of no apparent value, and bringing them home, which he had not done before. His wife had them hauled away in his absence, and he did not appear to notice their disappearance. In later years he collected tin cans, barrel hoops, a piece of an old stove, cast-off shoes, and other like articles. This he continued as long as he was able to be about. His wife died in 1885. Her death was a very severe shock to him. From that time on, his failure to recognize old friends became more frequent. He would frequently ask who passersby were, and, when told, would say, "It is strange I can't remember;" and, when the same person would repass shortly after, he would frequently ask the same question over again, and would appear confused. In 1885 he met his son-in-law Blake on the street, and, although on good terms, failed to recognize him. He would sleep during the day, and would repeat over old stories relating to his early life in the same

conversation to the same person, and would sit for a
long time staring vacantly into space.    During the
year 1885 he inquired why Blake, his son-in-law, did not
come to see him, when, in fact, Blake had been there
the day or evening before; and, when told of this by
his daughter, appeared confused.    In January, 1885,
he attended a wedding in his city, where he met some
ladies he had known for more than thirty years, and
did not know them.    After that he met one of them sev-
eral times on the street, and did not know her.    In 1885
an old lady friend and near neighbor called on
him, and he did not know her.    The will, as has
been stated, was dated February 18, 1886.    At
or about this time Mr. Bever was at the home of Mrs.
Blake, and Mrs. Blake says:    "Father, what is this
about Vin saying the farm is theirs?    Is the farm going
to be theirs?"    He said:    "Don't you mind what they
say, for you will get as much of my property as any of
my children."    Vin is the name of James Bever's wife.
In June, 1886, the father of Mr. Blake, whom Mr. Bever
had met before, was brought to Cedar Rapids very ill,
and there died on June tenth.    Mr. Bever had been to
see him almost every day.    After the death of Blake,
Bever went up to the room where the body lay, pushed
aside the coverings, and said, "Who is this?" then went
out without replacing the draperies, and without say-
ing anything.    In 1886, Mrs. Spangler went to Europe
for her health, and to find relief for her son.    Some one
of the family asked Mr. Bever to help pay the expenses,
and he said that her income was as large as James',
and that James had told him so.    He also said she was
getting fifty dollars to fifty-five dollars per month rent
for her house, and that would pay her expenses abroad.
When Mrs. Spangler went to Europe her income was
about seven hundred dollars per year, exclusive of
house rent.    After Mrs. Spangler returned from Europe

she did not live with her father, he said because her son's habits were not good. It also appears that he said he would like to have her stay, but others of the family thought differently. In 1887 he met an old acquaintance on the street, but did not know him, and, upon being told who he was, he asked, "Where does Mr. Bever live?" He was directed to his home, and had the appearance of being lost, although he was then on the street he lived upon. Mr. Bever was an active member of the Episcopal Church, and a member of the vestry. For many years he was very punctual upon his attendance at the vestry meetings. He was senior warden, and presided at the meetings, and would often call up subjects which had been disposed of; and would often sit in his chair and doze, and did not appear to take much interest in the meetings. After his fall, in 1872, he gave very little attention to the bank in which he was interested, and during the latter years of his life spent most of the time when at the bank in the back room, attending to his own private matters. One of the bookkeepers in the bank, whom he had known for many years, passed him upon the street frequently after 1886 or 1887, but he did not recognize him. In 1892, Mr. Bever was very nervous and weak. His lower jaw dropped, and he walked with his mouth open. In 1887 or 1889 he met Judge Trimble at Spirit Lake, and had a talk with him regarding some of the old residents of Cedar Rapids. In speaking of Judge Green, Mr. Bever did not seem to realize that he was dead until his recollection was jogged by his daughter. Judge Trimble describes him thus: "The expression of his face was rather that of vacancy or lack of intelligence,—lack of that vivacity which I knew was characteristic of the man in earlier

life,—and I saw there was a material change in the man. I noticed that a part of the time he kept his mouth open." In February, 1888, he went, in company with his son-in-law Blake, to pay his taxes, and took some papers out of his pocket, laid them on the table, and afterwards put them in his pocket again, and then thought he had given them to the treasurer. After they were found, the treasurer offered to give him receipts, and he said: "I guess you needn't; I will have to go down and see James about this." In the year 1888 he complained of his poverty, had disjointed and disconnected conversations with his hired men, talked in a childish manner to his cow, and muttered much to himself. Would talk to his hired man in the morning, and on the same day would not know him on the street after the man had spoken to him. He failed to recognize a lady friend of long years' standing, who was frequently at his house, a neighbor, and on intimate terms with him. When he discovered his lapse, he burst out crying. The same lady afterwards saw him twice, and he failed to recognize her. This lady, in speaking of Mr. Bever's condition in 1887 or 1888, said she noticed that he was breaking very rapidly. In 1888 another lady, an old and intimate friend of the family, met Mr. Bever at a reception in Cedar Rapids. Mr. Bever said to her that if he had known she was going to be there he would have brought his wife. Nothing was said for a moment, and then Mr. Bever again spoke and said, "Oh, Mary [meaning his wife] is gone." He very frequently failed to remember or recognize his friends up to the time of his death, and when told who they were would seem confused. Some time in 1888 he put in a whole afternoon having chattel mortgages drawn up about which there was no difficulty or controversy. He had

the instruments read and re-read to him, and was nervous, confused, and excited. In 1890 he stopped a friend, and inquired where Mr. Blake's office was, although he was familiar with the location, and was at the time within a block and a half of it. He also went into a harness shop to buy a watch guard. The proprietor directed him to a jewelry store, and he went out without saying more; and also went into a dry goods store and inquired if they sold liquor. In 1890 he went with his daughter to call upon a young married lady whom he had known all her life, but he failed to recognize her. While there he fell asleep twice in his chair. One Weare, a long-time citizen of Cedar Rapids, died on March 11, 1891, and was buried in his home town, the fourteenth. On the thirteenth Mr. Bever called at the house, and asked to see Mr. Weare. He was informed that Mr. Weare was dead, and to this responded, "Dead!" in an astonished manner. Mr. Weare died at Hot Springs, Ark., and his body was brought home for burial. Some time in May, 1891, Mr. Bever called at the Weare home, but failed to recognize a daughter with whom he was well acquainted. After a few moments he said, "I want to see Mr. Weare; where is Mr. Weare?" The daughter remarked: "Mr. Bever, father is dead." Before leaving, he again remarked: "Where is Mr. Weare?" He at this time had a childish expression, and he sat in the room as if he did not know where he was. He again met Miss Weare on the street in June or July, 1891. The lady spoke to him. He looked at her as if he did not know her, and she asked him if he did not know her, and he said, "No." She then explained who she was, and he said: "Oh, how is your father? I have not seen him for a long time. He always drives around, but I have not seen him. I must go around to the bank and see him." Mr. Weare had been president of a bank two or three

years before.    After going a little distance, Mr. Bever further said:    "Where is your father?    I don't see him."    The daughter explained the whole matter to him again.    This same lady met him again, but he failed to recognize her, and after being told who she was, he inquired again after her father and mother.    In the early part of 1891, about the time of Mr. Weare's funeral, Mr. Bever went to call on a sister of Mr. Weare, Mrs. Daniels, and on the way home he asked the person who accompanied him:    "Who is Mrs. Daniels?    What relation is she to Mr. Weare?"    He had known Mrs. Daniels from childhood, and had seen her very frequently.    In the year 1892 he met a gentleman at the foot of the stairs leading to a printing office, and demanded his rent.    He at the time had a blank expression, and spoke in a plaintive, supplicating voice.    This man owed him no rent, and, upon inquiring of the upstairs occupants, could find no one who did.    In 1891 he went to Clear Lake.    He had been there before, and knew that Mrs. Blake had a cottage there for several years.    When he arrived at the house, he asked whose it was, who lived there, and who the hostess was.    Mrs. Blake was there at the time.    And during this year, when he had returned from Clear Lake, he was driven to John Bever's house by Mr. John Bever.    When they arrived at the house he asked whose it was, and when he got inside asked where he was.

These are some of the more important facts and circumstances introduced in evidence by contestants to establish unsoundness of mind.    It is true that many of the matters come from the mouths of interested witnesses.    But in the nature of the case this must be so.    Aside from the interest these witnesses have, it is manifest that their testimony is entitled to great weight in an investigation of this kind, for they are the persons who are the best qualified to

judge of his condition.   When a question is as to whether lapses of memory, defects of understanding, and various idiosyncrasies are due to old age or to some form of dementia, we must depend upon those who are closest to the individual, who have watched his daily life, and compared and followed his peculiarities, to furnish us with the most satisfactory testimony. As against this testimony, we have a cloud of witnesses of more or less familiarity with the deceased, who testify to various transactions had with him of a business or social character, who say they never discovered any evidence of unsoundness of mind. We have, too, undisputed evidence that he attended to matters of private business, making leases, executing contracts, selling property, attending business or religious meetings, as a man possessed of all his mental faculties.   It would be an endless task to refer to all of these matters, and would serve no useful purpose.

Various expert witnesses were examined on either side of the case, and, as usual, their testimony was in decided conflict.   The experts introduced on behalf of contestants, in answer to hypothetical questions propounded to them, which it is claimed the evidence introduced tended to establish, answered that at the time of the making of the will, and at the time of the making of the codicil, Mr. Bever was of unsound mind, and gave it as their opinion that he was suffering from senile dementia.   These witnesses were superintendents of insane hospitals, and others having large experience with insane patients.   On the other hand, the physicians, or some of them, who had treated Mr. Bever, gave it as their opinion that he was sound of mind on both occasions.   It is insisted by appellants' counsel that the court was in error in allowing contestants to show any of the matters said to have occurred after the execution of the

will, and that at least a great part of the testimony was
too remote in point of time to throw any light on the
question as to the testator's condition in 1886.   Ordi-
narily this objection might be considered as well taken;
but where, as in this case, the disease, if it exists at all,
must of necessity be of long standing, and progressive,
we think testimony covering a connected period of six
years after the time of the execution of the papers is
not too remote.   One of the experts, on whose testi-
mony we must rely to furnish us information regarding
the malady in question, says, in speaking of the causes
of senile dementia:   "These changes in the brain take
place gradually, and begin a long time before any
change is noticed in the mind.   Senile dementia is a
progressive degeneration of the brain.   It involves
organic change."   Another says:   "The cells undergo
a degeneration; their functions are correspondingly
impaired.   The change takes place in the substance of
the brain before the symptoms appear.   It is a con-
tinuous and permanent change."   In the case of
*Shailer v. Bumstead,* 99 Mass. 112, it is said:   "The
previous conduct and declarations are admissible, and
so, by the weight of authority and upon principle, are
subsequent declarations, when they denote the mental
fact to be proved; for, by common observation and
experience, the existence of many forms of mental devel-
opment, especially that of weakness in those facul-
ties which are an essential part of the mind itself, when
once proved, imply that the infirmity must have existed
for some considerable time.   The inference is quite as
conclusive that such condition must have had a gradual
and progressive development, requiring antecedent
lapse of time, as that it will continue, when once proved,
for any considerable period 'thereafter."   See, also,
*Ross v. McQuiston,* 45 Iowa, 145; *Grant v. Thompson,* 4
Conn. 203; *Kerr v. Lunsford* (W. Va.), 8 S. E. Rep. 493;

*Chrisman v. Chrisman,* (Or.), 18 Pac. Rep. 6; *Dyer v. Dyer,* 87 Ind 13.; *Estate of Dalrymple* (Cal.), 7 Pac. Rep. 906; *Ashcraft v. De Armond,* 44 Iowa, 232.

With this preliminary question settled, we turn again to the evidence to determine whether the court was in error in denying proponents' motion for a verdict, and in overruling their motion for a new trial, in view of the undoubted and undisputed rules of law above quoted. Suppose that proponents had made their motion to take the case away from the jury at the conclusion of contestants' evidence, would it have been error to have sustained such a motion? Clearly we think it would have been. How, then, is the case changed by making the motion at the conclusion of the introduction of all the testimony? We think that unless it has been shown by the manifest preponderance of proponents' testimony that the verdict returned cannot be sustained on any reasonable hypothesis consistent with the case made, and is evidently the result of passion or prejudice, we ought not to interfere. See *Phillips v. Phillips,* 93 Iowa, 615. That the testator did conduct his private business matters with apparent judgment and sagacity; that he made leases and trades requiring the exercise of discretion; that he seemed to have a memory of past business events, and that to many of his business and social friends he gave no evidence of mental weakness,—cannot be denied. It is also conceded that he wrote the will with his own hand, which is a matter of no little importance. It is suggested by contestants' counsel that many of these business matters were in fact directed and dictated by his sons, and it is shown that in some instances he relied upon the judgment of his son, rather than his own, at the expense of breaking some of his contracts. It is also shown by some of the medical testimony that the fact that the testator carried

on business after the making of his will, the like of which he was accustomed to do for years before, which did not involve the creation of any new ideas, would not be incompatible with unsoundness of mind. It may be further suggested that much of the testimony to sustain his mental capacity came from business acquaintances who met him simply in a business way, while much of that produced on behalf of contestants was from those who were in his home and who were with him daily. Very many circumstances relied upon to prove unsoundness of mind related as happening in the presence of proponents or their near relatives are not denied, and neither of the proponents, nor any member of their families, who ought to know as much of the testator's conduct and actions while he lived with or near them, have undertaken to speak of his conduct or actions. We may be mistaken in the motives which led them to remain silent, and need only remark that ordinarily they would have placed themselves upon the stand to deny some of these alleged occurrences if they were not true. Then, again, they could no doubt have furnished us very satisfactory evidence of the condition of the decedent's mind had they been upon the stand. It may be that from the life of any man, covering a space of twenty years, we would be able to pick out a few isolated circumstances which, when placed in juxtaposition, would indicate insanity; but we think it is a rare case, indeed, where so many and so connected circumstances as are shown in this case can be picked out and grouped together from the life of any perfectly sane man. But be that as it may, and assuming that a great many circumstances proved do not of themselves show insanity, and that all of them taken together may not, yet the weight thereof was properly submitted to the jury for its determination, and it found the testator was of unsound mind when the

will and the codicil were written. We do not think we should interfere with its conclusions, especially in view of the fact that the learned district judge who tried this case, and who heard and saw the witnesses, was satisfied with the result of the trial, and refused to set aside the verdict because not sustained by the evidence. It may be that, if we had the case to try on its merits, we would come to a different conclusion. Indeed, there is a very strong showing of perfect mind and sound business capacity by the proponents, and had the verdict been the other way we certainly should not have interfered. But, as we have established by unquestionable authority, it is not our province to pass upon the real merits of the controversy, so long as there is a fair conflict in the testimony, so that reasonable minds, unfettered with prejudice and passion, might arrive at the verdict returned. It may be remarked in this connection that for some reason the codicil executed in July, 1891, was not offered for probate by the proponents. We can only surmise why this course was taken. It is doing no violence to the motives which actuate the conduct of the men to say that proponents had, at least, some doubt about being able to establish a disposing mind in the testator at that time. We are well satisfied that there is sufficient testimony to establish the mental unsoundness of Mr. Bever from, say, July, 1891, up to the time of his death. If he was unsound then, it is not improbable, in the light of the expert evidence, that he was also unsound at the time the will was executed, although he may have given no very marked outward evidences thereof at the time. We conclude, then, on this branch of the case, that there is a conflict in the testimony, and that, in view of the whole record, we ought not to interfere with the discretion of the trial judge.

II.    It is contended that, conceding the testator's unsoundness, it was incumbent on contestants to show that the will was not made during a lucid interval; and they cite *Blake v. Rourke,* 74 Iowa, 522, 38 N. W. Rep. 392, in support of their contention. In that case the testator had no disease of the mind which directly affected his mental faculties. The evidence shows that at times he suffered great pain, and that during these paroxysms on one or two occasions he did not know anything.   We there held that the burden was on contestants to show that the will was made while deceased was suffering with one of these temporary derangements of mind.   This is not the rule where general mental unsoundness is shown.   It only applies where the mental derangement is fitful and temporary. As said in *Hix v. Whittemore,* 4 Metc. (Mass.), 547: "There must be kept in view the distinction between inferences to be drawn from proof of an habitual or apparently confirmed insanity and that which may be only temporary.   The existence of the former, once established, would require proof from the other party to show a restoration or recovery, and, in the absence of such evidence, insanity would be presumed to continue.   But, if the proof shows a case of insanity directly connected with some violent disease with which the individual is attacked, the party alleging the insanity must bring his proof of continued insanity to that point of time which bears directly upon the subject in controversy, and not content himself with proof of insanity at an earlier period."    See, also, *Halley v. Webster,* 21 Me. 461; *Harden v. Hays,* 9 Pa. St. 151; *Jackson v. Van Dusen,* 5 Johns. 144.    Under these rules, then, the burden was upon the proponents to show that at the very time the will was executed deceased was of sound mind.   This question was pre-

sented to the jury, and they have found against the
proponents.   With their finding we will not interfere.

III.   Next it is insisted that the hypothetical ques-
tion propounded to the expert witnesses for contestants
was unfair, inaccurate, distorted, and untrue in many
particulars, and that objections to it should have
been sustained.   The rule heretofore announced
by this court with reference to such questions, in
the case of *Meeker v. Meeker*, 74 Iowa, 357, 37 N. W.
Rep. 773, is as follows:   "It is a general rule that
hypothetical questions put to experts should be based
upon facts which the evidence tends to show.   *   *   *
It is not required that the questions should be based
upon conceded facts, nor is technical accuracy required
in framing the questions.   If they are entirely without
the support of evidence, they should be excluded.
Ordinarily, opposing counsel will not be slow in
re-examination of the witness to correct the hypothesis
upon which the question is based, if it be incorrect."
In propounding such a question, counsel may assume
the facts in accordance with his theory of them.   It is
not essential that he state the facts as they exist, but
the hypothesis should be based on a state of facts which
the evidence tends to prove.   Under familiar rules of
practice, each side has its theory of what is the true
state of facts, and assumes that it has or can prove them
to the satisfaction of the jury, and, so assuming, shapes
hypothetical questions to experts accordingly.   The
question propounded to the experts for contestants in
this case is a very long one, covering more than twelve
pages of the abstract, and it is impracticable to set it
out in this opinion.   We have gone over it very care-
fully, and are fully satisfied that there is nothing in it
which the evidence, from contestants' standpoint, did
not at least tend to prove.   The question embodied not
only the matters we have before set out, tending to

show the insanity of the deceased, but many other circumstances of more or less importance connected with the history of his life and conduct, which the evidence tended to prove.    We are satisfied the hypothetical question was not objectionable on this ground. It is also contended that many of the facts. assumed in the hypothetical question are irrelevant and immaterial, and have no tendency to establish unsoundness of mind.    No doubt many of these circumstances, in and of themselves, had no direct tendency to show insanity.    But they were a part of the testator's history, and, when taken in connection with the other circumstances, were proper to be considered as. showing his condition of mind.

IV.    Counsel also contend that the hypothetical question embraced alleged declarations of the testator as to how he was going to dispose of his property, and as to the condition of his mind and memory, which should not have found place there.    They also contend that these declarations and statements were erroneously admitted as substantive testimony.    If they were properly admitted to establish the mental condition of the testator, then they might well be considered by an expert in arriving at his opinion as to decedent's condition of mind.    We have no doubt that all this testimony was admissible and properly referred to in the hypothetical question.    The case of *Sim v. Russell*, 90 Iowa, 656, is a ready answer to some of the objections now urged by counsel; and courts of much learning and eminent respectability have held that declarations of the testator, oral or written, are admissible, not only as a part of the *res gestae* on the issue of will or no will, but they may be received when the condition of the testator's mind is in question, or it becomes material to show the state of his affections.

In such cases the evidence is admissible simply as external manifestations of the testator's mental capacity, and not as evidence of the truth or falsity of the facts he states. Mental disturbance may be detected by declarations as surely as by conduct, and hence the declarations of persons charged with insanity are admissible in a chain of logical connection to show the mental condition existing when the will was executed. Schouler, Wills, section 193, and cases cited. In the case of *Sim v. Russell, supra,* we held that an unnatural and unreasonable disposition of the property by will might be considered upon the issue of mental condition. See, also, in this connection, *Fountain v. Brown,* 38 Ala. 72; *Marx v. McGlynn,* 88 N. Y. 357; *Horn v. Pullman,* 72 N. Y. 269. It must be remembered that when the testimony was adduced not only was the issue of mental unsoundness in the case, but also the questions of fraud and undue influence; and, if the substantive testimony admitted was properly receivable under either issue, there was no error in admitting it. As further sustaining the rulings of the court below, see *Bates v. Bates,* 27 Iowa, 113; *Ross v. McQuiston,* 45 Iowa, 145; *Stephenson v. Stephenson,* 62 Iowa, 165, 17 N. W. Rep. 456; *In re Last Will of Hollingsworth,* 58 Iowa, 528, 12 N. W. Rep. 590; *Muir v. Miller,* 72 Iowa, 590, 34 N. W. Rep. 429; *Parsons v. Parsons,* 66 Iowa, 758, 21 N. W. Rep. 570, and 24 N. W. Rep. 564; *Denning v. Butcher,* 91 Iowa, 426, 59 N. W. Rep. 69. The instructions of the court properly guarded these declarations and admissions of the testator, and we see no error.

V. It is said in argument that in the two recent cases of *Bennett v. Hibbert,* 88 Iowa, 154, 55 N. W. Rep.

95, and *Denning v. Butcher,* 91 Iowa, 425, 59 N. W. Rep. 73, we held, on facts stronger than those presented in the case at bar, that there was no evidence of unsoundness of mind.    The first case was triable *de novo* by this court, and is governed by different rules than the case at bar; and, in our opinion, the facts in this case tending to show incapacity are much stronger than in that.    The *Denning Case* was tried to a jury, and a verdict was rendered sustaining the will.    We saw no reason in that case for interfering with the discretion of the trial court in refusing to set aside the verdict on motion for a new trial.    As we have already said, had the verdict in this case been for proponents, we would not have interfered.

VI.    We are referred to a great many authorities which define and explain what degree of mental incapacity or unsoundness will invalidate a will.    It is needless to review them, for the rule has been so often announced in this state that there is no reason for mistaking it.    See *Bates v. Bates, supra; Webber v. Sullivan,* 58 Iowa, 260, 12 N. W. Rep. 319; *Meeker v. Meeker,* 74 Iowa, 352, 37 N. W. Rep. 773; *In re Will of Convey,* 52 Iowa, 197, 2 N. W. Rep. 1084.    The instructions given by the trial court were in line with the principles announced in these cases, were clear and unambiguous, and the jury could not have mistaken the tests to be applied.

VII.    A very earnest and determined assualt is made upon the experts used in the case, and upon expert testimony in general.    The gentlemen used as witnesses for contestants were doctors of high standing in the profession, who had had large experience with the insane.    One of them is the superintendent of the insane hospital at Independence, and another from a like institution at Mt. Pleasant.    Surely, if we are to profit by this character of testimony in any

degree, we ought to get light from these gentlemen. We may agree with counsel when they say that our system of selecting experts is wrong, and should be changed, but it does not lie in our power to do it. Experience has led us to believe that in many cases these witnesses are but adroit advocates of the theory upon which the party calling them relies, rather than impartial experts, upon whose unbiased judgment and learning a jury can safely rely. Even men of the highest character and integrity are apt to be prejudiced in favor of the party by whom they are employed, and, as a matter of course, no expert is called until the party calling him is sure that his opinion will be favorable. Yet, notwithstanding all this, we are often compelled in matters of this kind to rely upon the judgment of those who have made a life-long study of diseases of the mind, and who are able, by reason of their long experience, to detect symptoms of disease which less experienced eyes would overlook. There are cases where expert testimony is of great value, and we are not prepared to say that this is not one of them. The books introduced in evidence establish that it is exceedingly difficult, if not impossible, for an ordinary, unprofessional witness to distinguish between symptoms indicative of the natural decline incident to old age and symptoms strongly suggesting the disease of senile dementia. On questions of this kind we must rely upon the judgment and opinions of experts, who are able to make proper distinctions, and to furnish us the rules by which we may differentiate the one case from the other. See *State v. Townsend,* 66 Iowa, 741, 24 N. W. Rep. 535. Whatever may be our individual views upon these subjects, it is enough to say that such testimony is admissible under well-settled

and long-established rules, and it is for the jury to say what weight shall be given it.    It is also insisted that the theories of the witnesses in the case at bar are entirely worthless, because of the fact that it is conclusively shown that the testator attended to his business interests, made contracts, settled accounts, attended corporate and religious meetings, and otherwise conducted himself as one possessed of sound and disposing mind and memory.    We have already seen that the deceased did many of these things, and it appears to us that the jury might very well have found him capable of making the will in question.    But we find, in turning to the authorities on the question of senile dementia, written by men who have made a special study of the mind and its diseases, that they announce a rule in accord with the following quotation from Mandsley on Responsibility in Mental Diseases: "He may sell his property and speak of it as his afterwards; ask the same question over and over again, forgetting that it has been asked and answered; not recognize one whom he has previously known well; inquire after the health of some one who has been dead for some time, or ask after the health of the person with whom he is talking, as if he were asking after it from some one else,—and yet it may be proved by documents that he is all the while filling up and signing checks correctly, keeping his accounts accurately, and making no mistake in the management of his affairs." The experts introduced by contestants testify to practically the same thing.    If this be true, then the jury were warranted in finding the testator unsound of mind, notwithstanding the fact that he carried on many of his business transactions with apparent memory and discretion.

VIII.    Counsel rely upon the rule announced in *Meyer v. Houck*, 85 Iowa, 327, 52 N. W. Rep. 235, which

holds that, when a motion is made to direct a verdict, the trial court should sustain it when, considering all the evidence, it clearly appears to him that it would be his duty to set aside a verdict if found in favor of the party upon whom the burden of proof rests. This rule announces the duty of trial courts, and has no application to the question as to when a new trial should be granted by this court. We have already announced the rules governing us, and need not repeat them here. See, also, *Phillips v. Phillips, supra.*

IX. It is insisted that the court allowed contestants' counsel too great liberties in cross-examining proponents' witnesses, particularly the experts used by them. The rule is well understood, we think, that experts may be cross-examined on purely imaginary and abstract questions, assuming facts and theories which have or have not foundation in the evidence, and that the allowance of all such questions rests in the sound discretion of the court. Where such discretion is fairly exercised, we will not interfere. See *People v. Augsbury,* 97 N. Y. 501; *Railway Co. v. Falvey,* 104 Ind. 409, 3 N. E. Rep. 389, and 4 N. E. Rep. 908.

X. The following among other instructions were given by the trial court upon the weight and credit to be given to expert testimony: "(8) It is claimed by contestants that the deceased was, at the time of executing the will, afflicted with senile dementia, and that he was so afflicted before and after its execution, and until the date of his death, and much testimony has been introduced on this subject. You are to consider and weigh carefully all this evidence, including the evidence of experts, and if from the evidence you are satisfied that he was afflicted with this disease, and that it so affected his mind at the time of making his will that

he did not and could not recollect the property he was about to bequeath, the manner of distributing it, and the objects of his bounty, then you should find against the will on the ground of incapacity. In deciding this question, you may consider all the testimony produced tending to show the condition or state of mind of the deceased." "(10) Medical men have been called as experts on both sides. Some of these gave an opinion as to the mental condition of Mr. Bever, based upon hypothetical questions or statements of facts. Some have founded their opinion upon personal knowledge and observations and treatment of the deceased. This testimony, or the testimony of medical men of large experience in this class of cases, when they have testified touching the mental condition of the testator immediately before or at the time of the execution of the will in question, may be given by the jury more weight and consideration than the testimony of nonprofessional witnesses. It may be that the opinion of experts who had treated him, and had opportunities of observing him, and knowing his condition physically and mentally, might be entitled to greater weight than the opinion of experts who found their opinions on hypothetical questions; but this is a question for you, and you are to say and determine the value and weight such, and all such, opinions are to have with you as bearing upon the deceased's mental condition, and give them weight accordingly." "(19) The alleged want of mental capacity to make a will on the part of the deceased, Sampson C. Bever, is not to be determined by the jury by considering alone the eccentric or unusual acts, expressions, and conduct of the deceased, or failure of memory or physical failure on his part, if any, disclosed by the evidence; but you are to consider all the other evidence relating to his life, conduct, and business transactions, and all the evidence before you,

and from all of the same say whether he was sound or unsound at the very time of executing the will before you." The eighth instruction is complained of because it is said it directs the jury that they might give some weight to the opinions of experts, although some of the assumed facts stated in the hypothetical question might not have been found to be true. It is sufficient to say, in answer to this, that we do not think, reading the whole instruction through, that it will bear the interpretation placed upon it. The whole matter as to the weight, if any, to be given the testimony of the experts was left to the jury. The instruction is in harmony with the rule announced in *Meeker v. Meeker, supra.* It is also contended that the court erred in not saying to the jury, as a matter of law, that the evidence of experts who knew the deceased and had treated him was entitled to a greater weight than that of experts who founded their opinion upon merely hypothetical questions. We think the court went as far in this direction as he ought. It will not do to announce as a proposition of law a rule so broad as that contended for by appellants. It is peculiarly the province of the jury to determine the weight of the testimony, and it is always dangerous for a court to attempt to say that one class of testimony or one class of witnesses ought, under all circumstances, to be given more credit or weight than another. The court made a suggestion in the eighth instruction that they might find one class of testimony better than another, and further than that he did not go. Courts frequently announce rules for their own guidance in weighing testimony which could not be given to a jury without imminent danger of trespassing in their field. In this connection proponents asked the court to give the following instruction: "Where medical expert testimony is received, based upon a

purely hypothetical statement of facts,—that is, a statement of facts of which such experts have not personal
knowledge, but which they accept as true for the purpose of answering the question or questions propounded to them,—if it turns out that such hypothetical statement of facts is in material and in important
particulars incorrect, unfair, partial, and untrue, a jury
in such case should attach no weight whatever to the
answers of the medical experts founded upon such hypothetical statement of facts." This instruction was
refused, and no other was given relating to the subject,
except as above set forth. Error is assigned on this
ruling, and this presents the question we have the most
doubt about of any in the case. That the instruction
asked presented a correct rule of law there can be no
doubt. *In re Will of Norman*, 72 Iowa, 88, 33 N. W. Rep.
374; *Hall v. Rankin*, 87 Iowa, 261, 54 N.W.Rep. 218. But,
in view of the instruction given on the value of expert
testimony, was it error to refuse it, and should we
reverse the case upon that ground? is the inquiry.
In the following cases it was held to be error without
prejudice to refuse to submit instructions to the jury
announcing a proper rule of law. *West v. Railway Co.*,
77 Iowa, 654, 33 N. W. Rep. 479, and 42 N. W. Rep. 512.
In this case it is said: "The court must trust somewhat to the common sense of jurors." *Taylor v. Railway Co.*, 76 Iowa, 753, 40 N. W. Rep. 84. This case
holds that the refusal of the court to give a proper
instruction with reference to the weight of witness' testimony was error without prejudice. This language
appears: "The jury no doubt considered such failure
of the witness to explain his admissions, without special
directions from the court." *Minthon v. Lewis*, 78 Iowa,
620, 43 N. W. Rep. 465; *Norris v. Kipp*, 74 Iowa, 444, 38
N. W. Rep. 152; *State v. Curran*, 51 Iowa, 112, 49 N. W.
Rep. 1006; *Merrill v. Hole*, 85 Iowa, 66, 52 N. W. Rep.

4.    It has also been held by this court that it is not
error to refuse a proper instruction with reference to
the weight to be given the testimony of an impeached
witness, and as to what amounted to an impeachment,
when a general instruction is given, directing the jury
to consider all the circumstances in evidence, and give
to each witness such credit as they believe he is entitled
to.    *Upton v. Paxton*, 72 Iowa, 295, 33 N. W. Rep. 773.
The instruction under consideration related to the
weight to be given to the opinion of experts, based upon
hypothetical questions propounded to them.    The court
instructed the jury that the weight of these opinions
was for them to consider in view of all the other testi-
mony in the case.    We think we can well presume upon
the intelligence of the jury, and that they would know,
without being specially instructed, that if the hypothet-
ical question propounded to the experts was, in impor-
tant particulars, incorrect, partial, unfair, and untrue,
no weight should be given to an opinion based upon it.
Courts at all times must rely upon jurors possessing at
least ordinary intelligence, and we think that, if the
jurors in this case possessed a fair quantity of brains,
they well understood that no reliance could be placed
upon the opinions of experts, if the facts, or some of
the important ones, on which they founded their opin-
ions were untrue.    We do not think the proponents
were prejudiced by the refusal of the court to give this
instruction.    See, as sustaining our views, 2 Thomp.
Trials, section 2352, and cases there cited.    Some other
errors are complained of in the giving and refusal of
instructions.    We have examined them all, and it is
sufficient to say that we find no error.    Proponents are
in no position to complain of those relating to fraud and
undue influence, for these issues were found in their
favor.

XI.   Innumerable errors are assigned on the rulings of the court in the admission and rejection of testimony.   The length of this opinion precludes our taking them up *seriatim*.   The task would be almost endless should we attempt it.   It would be little short of miraculous did we not find some technical errors committed by the court during this long and exhausting trial.   The errors complained of may be grouped under five heads, that is to say:   (1) Error of the court in rejecting testimony of proponents' witnesses as to the appearance of the testator, and as to whether he acted in a rational manner or not; (2) in not allowing witnesses to testify as to whether testator talked in a pointed, clear manner or not; (3) as to whether he took any interest in church affairs; (4) as to his relative appearance at different times; (5) in striking out certain answers as conclusions, and as not being responsive.

The rule with reference to such matters is well understood, but there is always much difficulty in its application.   As said by this court in the case of *Yahn v. City of Ottumwa,* 60 Iowa, 432, 15 N. W. Rep. 257: "It is true that the dividing line between what is a fact and what an opinion is not and cannot be very clearly defined.   \*   \*   \*   It is competent for a witness to testify to his conclusion, when the matter to which the testimony relates cannot be reproduced or described to the jury precisely as it appeared to the witness at the time.   \*   \*   \*   It is competent for a witness, not an expert, to testify as to the condition of health of a person, and that he is ill or disabled, or has a fever, or is destitute.   And a witness may give his judgment whether a person is intoxicated at a given time."   See, also, *Severin v. Zack,* 55 Iowa, 30, 7 N. W. Rep. 404; *Smith v. Hickenbottom,* 57 Iowa, 735, 11 N. W. Rep. 664; *Parsons v. Parsons,* 66

Iowa, 757, 21 N. W. Rep. 570, and 24 N. W. Rep. 564; *In re Will of Norman*, 72 Iowa, 87, 33 N. W. Rep. 374; *Meeker v. Meeker*, 74 Iowa, 355, 37 N. W. Rep. 773. The court below did not at all times follow the rules laid down in these cases. But in most instances the error was subsequently cured, and in nearly all, the witnesses testified to their opinions with reference to the sanity of the testator. In looking over this voluminous record, and reading the testimony of almost countless witnesses who testified to transactions with deceased, covering more than twenty years of life, we are abundantly satisfied that the proponents were in no manner prejudiced by any erroneous rulings, such as are complained of. Two letters of deceased, one written from Clear Lake in 1888, another from Spirit Lake in 1890, each to John and Lottie Bever, were rejected. The handwriting was proved by others than those to whom they were addressed, but the court evidently thought they related to personal transactions, and excluded them. In this he was in error. But they each related to very insignificant social matters, and their rejection in view of the large number of other exhibits introduced covering the same period of time, was without prejudice, and clearly would not have affected the result. Complaint is also made of the admission of the testimony of Mrs. Blake, Mrs. Spangler, Mr. Blake, and some others, because of their relationship to the case. None of them testified to any personal transactions, and, under the rule established by this court in the case of *Denning v. Butcher*, 91 Iowa, 425, 59 N.W. Rep. 69, there was no error. We have patiently and carefully gone over this entire record, and, while we find some technical errors, we are clearly of the opinion that none of them were prejudicial to the proponents. As we have already indicated, it would be little short of miraculous to find an absolutely perfect record. But where a case has been so fairly tried as

this one seems to have been; where the record of a man's life has been gone over so fully and so minutely as was the testator's in this case; when it is apparent that upon a retrial of the case nothing of serious import could be produced additional to what is here presented,—we do not think we ought to seek to discover errors upon which to reverse it. While some of us would have been much better satisfied had the verdict been the other way, yet none of us think it is a case where we should interfere. The judgment of the District Court is *affirmed*.