[Civ. No. 16050.   First Dist., Div. One.   Nov. 10, 1954.]

Estate of CANDIDA LOMBARDI, Deceased.   STEPHEN LOMBARDI et al., Appellants, v. LORETTA TRANCHINA, as Executrix, etc., et al., Respondents.

Ferrari & Ferrari and Louis Ferrari for Appellants.

Cosgriff, Carr, McClellan & Ingersoll and James L. Minnis, Jr., for Respondents.

BRAY, J.—After the will had been admitted to probate a contest of the will subsequent to probate, containing five counts, was filed by testatrix' two sons. The court, sitting without a jury, found against contestants on all counts and entered judgment refusing to revoke probate of the will. Contestants appeal *only* on one count—the issue of undue influence. The will contest was tried with another action brought by the sons against the three daughters to set aside certain deeds. Although not consolidated, it was stipulated that the court might consider on the contest any or all evidence in the civil case.

QUESTION PRESENTED

Was there a presumption of undue influence, or if so, was it rebutted?

BACKGROUND

In order to understand the case the family history is important. The family originally consisted of Sebastiano, the father, Candida, the mother and testatrix, Stephen and August, sons and contestants, Loretta, Rose and Evelyn,

daughters and proponents. Loretta is executrix of the will which was executed in December, 1941. (Testatrix died in 1951, almost 10 years later.) Sebastiano died in January, 1941. By will, he left half of his estate to Candida and divided the other half equally between the five children. During probate a dispute arose as to the ownership of the "Salida Ranch," the title to which was in the name of Stephen and his wife, some cattle thereon and on another ranch, and certain shares of dairy stock in the names of Stephen and August. Candida claimed these properties as belonging to the estate, and listed them in the inventory. The two boys contended they belonged to them, as the title showed. The girls supported the mother's contention which was that the properties had been placed in the boys' names for financing only and without intent to convey absolute title. Considerable evidence was introduced here to support the conflicting claims to title. It is unnecessary to determine which claim was correct. The daughters at the time wanted the mother to sue the sons to recover these assets for the estate. However, Candida stated, "No, they are my sons and I don't want to sue them." A written compromise was arranged in August, 1941, under which the sons waived all of their respective interests under Sebastiano's will in consideration for which they retained the assets of the estate standing in their names. Candida's attorney testified that she told him she would go along with the compromise but would give all her property to the girls. He further testified that the girls agreed to the compromise for that reason.

Although Candida accepted the compromise, she apparently felt that her sons got more than their fair share of the father's estate. Subsequently she executed deeds to the daughters, but kept the fact secret as "she was afraid of the boys."

### EXECUTION OF THE WILL

The will was executed December 2, 1941, approximately four months after the compromise was signed. About five or six days before it was executed, Candida phoned the attorney, asking him to come to her home. She was alone in the house and gave him directions for the will. He returned to his office, prepared the will, and in a few days phoned Candida to come to his house to execute it. At Candida's request Loretta drove her there. There were six persons present: the attorney and his wife, Mr. and Mrs. Burden whom the attorney had requested to come to act as witnesses, Candida

and Loretta. After the usual introductions and pleasantries, the attorney invited Candida to step into the breakfast room with him in order to discuss the will. The mother hesitated signing the will or saying that it was her will and asked the attorney to call Loretta into the room. The attorney then read to Candida from the carbon copy, Candida following along on the original. Loretta, although named in the will as executrix and as one of the legatees, took no part in the proceedings other than being present. The attorney asked Candida if she realized she was disinheriting her sons. She said " 'They took property belonging to the estate' and various other reasons." The clause concerning the sons read: "My two (2) sons, STEPHEN LOMBARDI and AUGUST LOMBARDI, having acquired from the estate of my said deceased husband, SEBASTIANO LOMBARDI, an amount substantially more than that acquired by my said daughters, and believing my said sons to be amply provided for from the estate of my said deceased husband, and believing further that each of my said sons has sufficient worldly goods unto himself, I give, devise and bequeath no part of my estate to my said sons, STEPHEN LOMBARDI and AUGUST LOMBARDI." At no time did the attorney receive any instructions or suggestions concerning the will from any of the daughters.

After Candida approved the will as drawn, the attorney called the witnesses into the room and in their presence asked testatrix if she was acting of her own free will, if that was her will and if she wanted the Burdens to act as witnesses. She said she did and thereupon the will was executed. Loretta was still present but did and said nothing. At Candida's request, the attorney took the will to his office where it remained until after her death. Candida was in her seventies at the time of the execution of the will. No one testified that her mental faculties were impaired. The doctor who treated her for asthma about that time, the doctor who treated her for several years before her death, and Mrs. Burden, testified that she seemed mentally normal.

As evidence of alleged undue influence contestants rely on the following: Daughter Rose lived with Candida. Loretta was apparently quite close to her mother, helping her in her business transactions. Her mother had discussed with her the funeral parlor to which she wanted to be taken in case of death. When Candida made the deeds to the daughters, she gave them to Loretta. She also gave her the combination to her safe. Loretta drove her mother to the attorney's home

and was present during the execution of the will. Neither the mother nor the daughters informed the brothers of the execution of the deeds or the will. The mother suffered a cerebral hemorrhage on a Saturday morning and died early the following Monday. Although the girls knew the seriousness of her illness, none of them informed their brothers until after she died. Loretta had gone to her own safe deposit box, taken the deeds executed by Candida to the daughters and recorded them. Loretta testified that her mother when she gave her the deeds instructed her to record them upon her death. Candida's brother was not immediately notified of the death although he lived in the same house where it occurred. August, who was well at the time of the execution of the will, developed in 1944 a malignant disease and had not been able to work since. (Contestants contend that except for the influence of the girls the mother might have changed her will at least to take care of August, although there is no evidence upon the subject.) It will be observed that there was not one iota of testimony that the girls, or any of them, actually procured the making of the will or that the will was not the free and voluntary act of Candida. ▓▓▓▓ Contestants at most show opportunity, which alone is insufficient to set aside a will.

▓▓▓▓ Contestants intimate that the court in effect granted a nonsuit and hence the rules concerning nonsuit would apply here. There is no basis for this intimation. While respondents moved for a nonsuit at the end of contestants' case and thereafter offered no evidence, the court suggested that the case be submitted on the merits, later saying, "We don't go for these nonsuit things." The record is clear that the court decided the matter on the merits. The attorney who drew the will, both witnesses to it, Loretta, Evelyn, a real estate agent who had done business with Candida, the notary before whom Candida acknowledged the deeds, the doctor who treated her from 1948 until her death, the doctor who treated her from 1938 to 1945, and both sons, had testified. The court made findings of fact and conclusions of law and a judgment based thereon.

Contestants depend principally upon their contention that the circumstances raised a presumption of undue influence and that the evidence did not overcome that presumption. They contend that all of the elements stated in 26 California Jurisprudence, section 19, page 647, and in *Estate of Llewellyn*, 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419], both cited by contestants, as necessary to create a presumption

of undue influence and to shift the burden of proof were present here. We will consider those elements seriatim.

1. "The provisions of the propounded instrument are unnatural." Although the will disinherited the sons and therefore at first glance appears to be unnatural, it is not so in view of the history of the family. The mother was not satisfied with the compromise made with her sons and with some basis believed that they had received more than their fair share from the father's estate and for that reason resolved to give all her estate to the daughters. ▉ There was nothing unnatural for a mother who felt that her sons were already adequately cared for and had already received more than their fair share of the family estate to give her property to the daughters. "The probative force of these indicia of imposition or undue influence may be overcome by other circumstances which show affirmatively that the decedent's volition accompanied the testamentary act." (26 Cal.Jur. § 20, p. 649.)

▉ 2. "The dispositions of the instrument are at variance with the decedent's testamentary intentions." There is absolutely *no* evidence tending to show that testatrix ever intended to dispose of her estate in any way other than the manner in which it was done. On the contrary, the will was in accord with her intention expressed not only to the daughters but to the attorney, both at the time of making the compromise and of making the will. There is no evidence that after August became ill and could no longer work she ever intended to change her will.

3. "The relations between the alleged wrongdoer and the decedent afforded to the former an opportunity to control the testamentary act." ▉ Unquestionably the daughters were in a confidential relationship with the mother, and therefore they had the opportunity to influence her. However, there is not one iota of evidence that they attempted to do so. ▉ ". . . as was said in *Estate of Easton,* 140 Cal.App. 367, 371 [35 P.2d 614], 'proof of mere opportunity to influence the mind of the testatrix, even though coupled with an interest or with a motive to do so, is insufficient. In order to warrant setting aside a will on this ground there must be substantial proof, direct or circumstantial, of a pressure which overpowers the volition of the testator and operates directly upon the testamentary act'; also that mere suspicion that undue influence *may* have been used is not sufficient to warrant the setting aside of a will on that ground . . ." (*Estate*

*of Watkins,* 81 Cal.App.2d 465, at 475-476 [184 P.2d 192] ; to same effect, 26 Cal.Jur., § 21, p. 651; *Estate of Kilborn,* 162 Cal. 4, at p. 11 [120 P. 762].) ". . . where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, *and has actually participated in procuring the execution of the will,* the burden is on him to show that the will was not induced by coercion or fraud. . . . However, the confidential relation alone is not sufficient. *There must be activity on the part of the beneficiary in the matter of the preparation of the will.*" *(Estate of Burns,* 26 Cal.App.2d 741, 749 [80 P.2d 77] ; emphasis added.) The presence of Loretta during the execution of the will was a circumstance which might indicate undue influence at the moment of execution, were it not well explained by the history of the family and all the evidence in the case. "It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator. *(Estate of Donovan,* 114 Cal.App. 228, 233 [299 P. 816].) " *(Estate of Welch,* 43 Cal.2d 173, 178 [272 P.2d 512].)

There was no evidence whatever of any "pressure which overpowers the volition of the" testatrix. Significantly, although the girls tried to get the mother to sue the brothers, she refused to do so. ██ ". . . mere opportunity, even if coupled with a motive to influence a testamentary act, is not sufficient to invalidate such an act *(Estate of Kilborn,* 162 Cal. 4, 11 [120 P. 762]). And the evidence must indicate more than general influence. The influence necessary to invalidate a testamentary document must be a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made [citations]." *(Estate of Llewellyn, supra,* 83 Cal.App.2d 534, 564.)

While there was opportunity for the daughters to influence the mother, there was no evidence bearing upon the testamentary act indicating coercion or lack of free agency on the part of Candida when she executed the will. (See *Estate of Welch, supra,* 43 Cal.2d 173, 178, for necessity of such evidence.) On the contrary the evidence completely dispels any inference of coercion which might arise because of the mother's declination to sign the will in Loretta's absence.

██ 4. "Decedent's condition was such as to permit of a subversion of his freedom of will." There is no evidence that her condition was of the kind mentioned. Contestants

proved that testatrix had been ill frequently during the period directly prior to the testamentary act. They proved that testatrix was of an advanced age at the time (72 years). But, to refute the inference that testatrix was in a condition permitting subversion of her free will, there is overwhelming evidence. Both doctors testified that she was not mentally weakened by her asthmatic and bronchial attacks. There was evidence that she had very satisfactorily acted as executrix of the will of her late husband. She refused to sue her sons over the disputed ranch and dairy stock, *despite* the urging of the three daughters. The real estate agent testified that she had good logical reasons for selling certain property in 1950. Both witnesses to the will thought she was "alert" and "up and coming for a lady as elderly as she looked." All three daughters testified as to their mother's capable management of her property. As said of the testatrix in *Estate of Welch supra,* 43 Cal.2d 173, 178: Her "mental and physical condition was not shown to have been such as to permit a subversion of her freedom of will or to negate her independent management of her own affairs."

5. "The alleged wrongdoer was active in procuring the instrument to be executed." There is no substantial evidence of such activity. Testatrix herself called the attorney. She alone talked to the attorney and furnished the data for her will. The attorney called her and asked her to have one of her daughters drive her over to his home for the formalities of execution. Loretta drove her over and was present when the will was read and executed. While at the attorney's home, Loretta did not enter into the conversation regarding the will and its contents before, during or after the execution of the will, nor by gesture or otherwise attempt to influence her mother, or indicate whether she thought her mother should or should not sign the will. The attorney kept the will.

The mere presence of Loretta at testatrix' request at the reading and execution is not sufficient to supply the element of activity. "Before a testamentary document will be overthrown because of the exercise of undue influence, the proven circumstances must be inconsistent with voluntary action on the part of the testator." (*Estate of Llewellyn, supra,* 83 Cal.App.2d 534, 566.)

Assuming, as contended by contestants, that a presumption of undue influence was raised by the confidential relationship of the girls with their mother, and that the burden shifted, proponents have more than rebutted a prima

facie case, by showing that under the family situation the provision was natural, that the instrument was not at variance with decedent's expressed testamentary intent, that testatrix had a mind of her own and was not subject to subversion of her will, and, most important, that the daughters were not active in procuring the will.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied December 10, 1954, and appellants' petition for a hearing by the Supreme Court was denied January 3, 1955. Carter, J., was of the opinion that the petition should be granted.