[Civ. No. 5302. Fourth Dist. Apr. 11, 1956.]

Estate of EDWARD M. KEENEY, Deceased. HELEN FRAZIER et al., Respondents, v. JULIA McMANN, Appellant.

Douglas A. May and Harvey E. Burnett for Appellant.

L. Kenneth Say and Lewis W. Boies, Jr., for Respondents.

MUSSELL, J.—Proponent in this will contest appeals from a judgment entered on a verdict in favor of contestants. An attempt is made to appeal from an order denying proponent's motion for a new trial and since such an order is not appealable, the attempted appeal therefrom is dismissed. (*Estate of Dopkins*, 34 Cal.2d 568, 569 [212 P.2d 886].)

The decedent, Edward M. Keeney, died on January 11, 1954, leaving a will executed on February 21, 1953, in which he bequeathed the sum of $100 to each of his three adult daughters and all of the remainder of his estate to his sister, Mrs. Julia McMann, proponent of said will and named therein as executrix. The three daughters, Helen Frazier, Doris Line, and Blanche Stephens, contested the probate of the will on the grounds that the deceased, at the time of the execution thereof, was not of sound and disposing mind; that the will was not executed in a manner and form required by law and that it was procured by undue influence of Julia McMann. A jury trial was had and two interrogatories were submitted to the jury, as follows: (1) Was the testator of sound mind at the time he executed the will?; and (2) Was undue influence exercised in the execution of the will? The jury was unable to reach a verdict as to the first interrogatory but answered the second in the affirmative. The trial court thereupon rendered judgment that the will was executed under and by virtue of the undue influence of Julia McMann and by reason thereof the will was denied admission to probate. Julia McMann appeals from the judgment on the grounds that there is no substantial evidence to support the allegations of undue influence at the time the will was executed; that prejudicial error was committed by the trial judge; that the court erred in restricting proponent's examination of witnesses for contestants; and that the court erred in the giving and refusing of certain instructions.

Edward M. Keeney was a pensioned Spanish-American War veteran. At the time of his death he was approximately 75 years of age and was then residing alone in the city of Fresno. In 1946, at Keeney's request, Julia McMann came to California and took care of him at his home for several months during the illness of his wife. In February, 1952, his wife died and on August 14, 1952, he suffered a coronary attack and was taken to the Veterans Hospital in Fresno, where he remained until December 22, 1952. Upon his discharge on that date he returned to his home where his meals and personal needs were taken care of by Julia McMann, who was then living

in an apartment house in Fresno with her husband. On January 14, 1953, Helen Frazier, one of the contestants, filed a petition in the superior court seeking her appointment as guardian of the person and estate of her father. A hearing was had on this petition on January 21, 1953, and the court found that Keeney was competent and denied the petition. On January 23, 1953, Keeney executed a will leaving one-fourth of his estate to each of his three daughters and one-fourth to his sister, Julia. This will was destroyed on February 21, 1953, and on that date the will which is the subject of this controversy was executed. It was offered for probate by Julia McMann on January 20, 1954, and this contest resulted.

Henry O. Smith, a close friend of the decedent, testified at the trial that he visited Keeney many times at his home; that on or about January 15, 1953, he stopped in to see Keeney and Keeney showed him a paper that had been served on him and stated that his daughters wanted to have him declared incompetent and a guardian appointed; that he seemed deeply hurt about it and asked what he should do, stating that he wanted help, that he could manage his own affairs and did not want a guardian. Smith further testified that he told Keeney he was going to need an attorney and that he would help him; that he suggested that he (Smith) talk with Julia Mc-Mann and see what he (Keeney) should do about it; that he discussed the matter with Julia and she asked him to recommend an attorney; that he recommended Mr. Douglas May, an attorney in Fresno, and arranged for an appointment for Mrs. McMann. At the request of Mrs. McMann, Mr. May called upon Mr. Keeney at his residence and was employed by him to contest the application for appointment of guardian.

Mr. May testified that when he was employed in the guardianship proceedings Keeney told him he did not want his daughters to handle his property; that they were trying to put him in a rest home and get his money and that he did not like it. May further testified that when he was taking Keeney home after the guardianship hearing Keeney stated he wanted to make a will leaving everything to his sister, Julia; that his children had taken him into court and that he was through with them. May suggested to Keeney that he was "just peeved" at his daughters and would get over it and that he had better think it over; that Keeney said he would and no definite instructions were given as to the preparation of a will on that date. May further testified that he talked to

Keeney on the telephone and Keeney stated he had made up his mind and wanted a will made out giving one-fourth to each of his daughters and one-fourth to his sister, Julia; that he (May) prepared a will in accordance with these instructions and it was executed on January 23, 1953; that when this will was executed, Keeney stated that it would be "all right for the time being"; that two or three days prior to February 21, 1953, his secretary informed him that Mr. Keeney wanted him to come out to his home, that he wanted to rewrite his will; that he telephoned Keeney's home and Mrs. McMann, who answered the 'phone, stated that Keeney wanted to rewrite his will and wanted him to come out and talk to him about it; that he did not want to keep coming out and asked Mrs. McMann if Keeney would state the changes he desired to be made so he, May, would not have to make an extra trip; that Mrs. McMann then told him how Keeney wanted the will changed and he drafted the will with the suggested changes and put it in his pocket; that on the morning of February 21, 1953, Mrs. McMann 'phoned him at his home and stated Mr. Keeney wanted him to bring the will right over that morning because he had a heart "spell" and was going to the hospital; that he immediately went to the house and in the presence of Albert Mankini, one of the subscribing witnesses, a Mrs. Ramsey, and Mr. McMann, read the will to Mr. Keeney, calling his attention to the changes made in it; that Mr. Keeney stated it was exactly what he wanted and that he had changed his will because his sister had been good to him and that since he was in court, his daughters had not been near him. The will was then signed by the testator and the subscribing witnesses.

Shortly thereafter Keeney was taken to the Veterans Hospital where he was examined by Dr. Cheu. The doctor, after examining the patient and talking to him, determined he should be accepted immediately as a patient in critical condition. Keeney was placed in an oxygen tent and sedatives were prescribed. He remained a patient at the hospital until May 4, 1953. He was then discharged and returned to his home, where he remained until May 15, 1953, when he was again taken to the hospital and there remained until his death on January 11, 1954.

The record shows without question that the decedent was in a critical condition when received at the hospital on February 21, 1953. He was suffering from severe heart failure, resulting in shortness of breath and an edematous condition. However,

there is evidence that he was in full possession of his mental faculties at the time he executed his will and stated that it was exactly what he wanted. The doctor who examined him at the hospital, H. O. Smith, a personal friend, Mr. May, his attorney, Albert Mankini, his next door neighbor, Mrs. Ramsey, Julia McMann, and Dr. Callaway, his personal physician, all testified he was competent. While contestant Doris Line and her husband testified he was forgetful, they did not testify he was mentally incompetent. Helen Frazier testified that on December 22, 1952, her father told her he had never made a will and did not intend to make one because everything would go to his three daughters if he made no will. However, this statement was made long before she filed a petition to be appointed his guardian and the evidence clearly indicates that the reasons Keeney made the changes in his will on February 21, 1953, were that he resented the attempt to declare him incompetent, that his daughters had left him alone, and that his sister had taken care of his person and property.

Appellant's principal contention is that the evidence was insufficient to support the jury's finding of undue influence and we are of the opinion that this contention must be sustained. The rules applicable are stated in *Estate of Welch,* 43 Cal.2d 173, 175-176, 178 [272 P.2d 512], as follows:

"In *Estate of Arnold,* 16 Cal.2d 573, at page 577 [107 P.2d 25], the rules governing the determination of whether a testamentary instrument is the product of undue influence are stated as follows: 'In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz,* 136 Cal. 558, 583 [69 P. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevit,* 95 Cal. 17, 33 [30 P. 101].) Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator. (*Estate of Keegan,* 139 Cal. 123, 127 [72 P. 828].) . . . mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. (*Estate of Easton,* 140 Cal.App. 367, 371 [35 P.2d 614].)

" ' "The unbroken rule in this state is that courts must refuse to set aside the solemnly executed will of a deceased person upon the ground of undue influence unless there be proof of 'a pressure which overpowered the mind and bore down the volition of the testator at the very time the will was made.' (*Estate of Gleason*, 164 Cal. 756, 765 [130 P. 872].)" ' (Citations.)

"It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator. (*Estate of Donovan*, 114 Cal.App. 228, 233 [299 P. 816].)"

In *Estate of Greenhill*, 99 Cal.App.2d 155 [221 P.2d 310], in a will contest, it was held that the trial court properly granted a nonsuit on the issue of the widow's undue influence over the testator, although she made active efforts to secure the execution of the will, where the testator had selected the attorney who prepared it, and the evidence failed to show pressure by the widow on the testator's testamentary act. In that case, as here, the testator was critically ill at the time the will was executed and in that connection the court said, "The claimed infirmities of mind or body must be shown to have had a direct bearing upon the testamentary act," and held that there was no evidence presented showing any irrationality on the part of the testator or that he was not conscious of his surroundings or acts either before or during the time of the execution of his will. It was further held that nothing more was shown than the presence of an opportunity for appellant to influence the testator's mind with a possible interest or motive so to do; that this was totally insufficient, and that before a testamentary document will be overthrown because of the exercise of undue influence, the proven circumstances must be inconsistent with voluntary action on the part of the testator and that substantial evidence must be produced that pressure was brought to bear directly upon the testamentary act.

 The presumption of undue influence raised by proof of a confidential relationship is rebuttable (*Estate of Lombardi*, 128 Cal.App.2d 606, 613 [276 P.2d 67]), and the evidence here produced was sufficient to overcome any such presumption. While the evidence indicates the appellant had an opportunity to influence the testator, there is no evidence that she did do so. As is said in *Estate of Lombardi, supra,* 611 "(t)he mere suspicion that undue influence

may have been used is not sufficient to warrant the setting aside a will on that ground.''

In the instant case, the will was prepared by an attorney selected by the testator on the recommendation of his friend, H. O. Smith. There is no showing that appellant brought any pressure to bear upon the testamentary act of the decedent. The will was read to and executed by him in the presence of several witnesses and the reasons for its provisions were stated by him at the time and were substantially as stated by him on other occasions to his attorney and his friend, Mr. Smith. The record shows that the decedent lived for several months after the execution of the will involved and there is no evidence that he was dissatisfied with its provisions or that he suggested changes therein. It is apparent from the record that the action of the contestant, Helen Frazier, in attempting to have the testator declared incompetent resulted in the changes made in the will of February 21, 1953. Under the rules announced in the foregoing decisions and the circumstances shown, it must be held that there is no sufficient evidence in the record on the issue of undue influence to sustain the jury's verdict. In view of this conclusion, it is unnecessary to pass upon the claimed errors of the trial court in his ruling as to the admissibility of evidence or in instructing the jury.

The judgment is reversed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied May 9, 1956, and respondents' petition for a hearing by the Supreme Court was denied June 7, 1956. Carter, J., Traynor, J., and McComb, J., were of the opinion that the petition should be granted.

Carter, J., then filed the following opinion:

CARTER, J.—I have today filed a dissenting opinion from the order denying a hearing after decision by the District Court of Appeal in *Estate of Bullock, post,* p. 944 at p. 950 [295 P.2d 954, 297 P.2d 633], which involves the same problem as is involved in the case at bar and I here adopt the discussion of this problem in my dissenting opinion in that case.

The factual situation in the two cases is, of course, entirely different, but the facts of the case at bar which I shall set forth at length herein clearly support the determination of the jury and trial judge that the will here involved was

procured by the undue influence of the proponent. Those facts are as follows:

At the time of the decedent's death, he was approximately 75 years of age and was residing in Fresno. In 1946, at decedent's request, Mrs. McMann came to California and took care of him at his home during his wife's illness. In 1952, Mrs. Keeney died and shortly thereafter, Keeney suffered a coronary attack and was taken to the Veterans' Hospital in Fresno where he remained about four months. Upon his discharge in December, he returned to his home where Mrs. McMann, who had moved to Fresno with her husband, took care of his meals and personal needs. On January 14, 1953, one of his daughters filed a petition in the superior court seeking her appointment as his guardian. A hearing was had on January 21, 1953, and it was found that Keeney was competent and the petition was denied. *On January 23, 1953,* Keeney executed a will leaving one-fourth of his estate to each daughter and his sister. That will was destroyed on February 21, 1953, and the present one executed on that day. The will was offered for probate by Julia McMann on January 20, 1954.

There was testimony by one Smith, a close friend of the decedent, that Keeney was hurt by the action taken by his daughter and that he did not want a guardian. Smith talked with Julia McMann about what Keeney should do about it and Julia asked Smith to recommend an attorney. The attorney recommended by Smith was Douglas May. Mrs. McMann saw Mr. May and arranged for him to call on Keeney at his residence. Keeney employed May to contest the application for appointment of a guardian. Mr. May testified that Keeney told him that he did not want his daughters to handle his property; that after the guardianship proceedings while May was taking him home, he said he wanted to leave his property to his sister, Julia, and that he was through with his children. May suggested that he think it over and that Keeney said he would. May further testified that he talked to Keeney on the telephone and Keeney stated he had made up his mind to will one-fourth of his estate to each daughter and his sister. May also testified that two or three days prior to February 21, his secretary informed him that Keeney wanted him to come to his home to rewrite his will; that he called and talked to Mrs. McMann who told him how Keeney wanted the will changed; that he drafted the changes and on the morning of February 21, 1953, Mrs. McMann called

him and told him that Keeney had had a heart attack and that he went immediately to the house and in the presence of three witnesses, one of whom was the husband of the proponent, called Keeney's attention to the will; that Keeney stated it was exactly what he wanted and that he had changed his will because his sister had been good to him while his daughters had not. The will was signed by the testator and the subscribing witnesses. The testator was then taken to the hospital in a critical condition. The record shows that he did not recognize his daughters that evening. He remained in the hospital until May 4, 1953, when he was returned to his home where he remained until May 15, 1953, when he was again taken to the hospital where he remained until his death. From the time of the incompetency hearing, Mrs. McMann lived in her brother's home.

It should be noted that the District Court of Appeal, in commenting on a statement made by one of the daughters that her father, on December 22, 1952, had said he wanted his property evenly divided between the three of them and so had not made a will, said that "this statement was made long before she filed a petition to be appointed his guardian and the evidence clearly indicates that the reasons Keeney made the changes in his will on February 21, 1953, were that he resented the attempt to declare him incompetent, that his daughters left him alone, and that his sister had taken care of his person and property." In this connection, it should be noted that *after the incompetency hearing on January 21, 1953, on January 23, 1953 the first will was executed leaving the property equally divided between his three daughters and Mrs. McMann.* It was not until February 21, 1953, the day he went to the hospital in a critically ill condition that he executed the will leaving the major part of his property to his sister.

An examination of the record shows that the proponent sustained a confidential relationship to the testator; that she unduly profited by the will; and that she actually participated in procuring its execution. This evidence raised a presumption of undue influence (*Estate of Pellegrini,* 138 Cal.App. 2d 143 [291 P.2d 558]) which the jury, properly instructed, undoubtedly concluded was not overcome by any evidence to the contrary. The proponent testified that she destroyed the first will at the decedent's request and that, also at his request, she told Mr. May how to make out the new will. The jury as trier of the fact was free to disbelieve her testi-

mony if it chose, which it obviously did inasmuch as it returned an affirmative answer to the interrogatory concerning undue influence on her part.

In the instant case, we have a motion for a directed verdict on the part of proponent denied, eleven members of the jury finding that undue influence was exercised by the proponent, a motion made by the proponent for a new trial denied, and then an appellate court reweighing the evidence to conclude that no undue influence was exerted by the proponent. The question of undue influence is one of fact to be determined by the trier of fact—in this instance the jury. The jury is the sole judge of the weight of the evidence, and the credibility of the witnesses, and its determination should not be disturbed where, as here, there is ample evidence in support thereof.

If this court were disposed to give effect to section 19 of article VI of the Constitution of California and section 371 of the Probate Code it would have granted a hearing and affirmed the judgment of the trial court.