[Civ. No. 17173.   First Dist., Div. One.   Jan. 18, 1957.]

RALPH VITALE, an Incompetent Person, etc., Respondent, v. LOUISE VITALE, Appellant.

H. W. Glensor and Donald J. Kennedy for Appellant.

Alfred J. Harwood for Respondent.

BRAY, J.—On the ground of plaintiff's unsoundness of mind at the time of the marriage plaintiff was granted a judgment annulling it. Defendant appeals, claiming insufficiency of the evidence to support the finding that plaintiff was of unsound mind on the day of the marriage and that on the contrary, the evidence conclusively proves him to have been of sound mind on that day.

### EVIDENCE

Defendant correctly states that the degree of mental capacity at the precise time when the marriage is celebrated controls as to its validity or invalidity, and that if a marriage is contracted during a lucid interval the marriage is valid. (See 38 C.J. p. 1288; 55 C.J.S. p. 825.)

Plaintiff is a 56-year-old plumber of Italian parentage. Defendant is a 38-year-old employee of a telephone company. They met in the late summer of 1952 and started going out together. By Christmas plaintiff began proposing marriage. Defendant, because of ill health, refused. In May, 1954, defendant finally accepted and on May 24th they were married in Reno. They returned to plaintiff's home in Palo Alto and lived together there until June 6th. On that day plaintiff went to a hospital. Defendant learned that he was there as a mental patient, and upon a doctor's advice, she signed a petition charging him with being mentally unsound. He was transferred to Agnew State Hospital, and after a hearing committed there, where he is still confined.

Plaintiff's son Frank testified that when plaintiff returned November 2, 1953, from a trip to Europe his father had changed. Frank then related many instances in which his father talked incoherently, had hallucinations, believed that some organization was after him, and that television programs, cards in a drug store and other matters evidenced

plots against him. In Frank's opinion his father was of unsound mind. Asked by defendant as to whether in his opinion plaintiff was of unsound mind at all times between November 2, 1953, and the date of the trial, including May 24th, the day of the marriage, Frank replied affirmatively.

Mrs. Tharp, a real estate agent who knew plaintiff well for over 10 years, testified that after returning from Europe plaintiff acted "very odd," was upset, heard noises, had been "framed" by a woman who was after his money and from whom he was trying to get away (which was untrue), pointed to a dog on a postcard and claimed it was a woman. In her opinion plaintiff was very unsound and confused.

One Beccelli knew plaintiff for about seven years. After plaintiff's return from Europe, plaintiff stated that people were following him. Plaintiff unjustly accused the witness of putting white powder in his coffee. In August, at Agnew when the witness stated that he had heard plaintiff had been married, plaintiff stated he knew nothing about it. In the witness' opinion plaintiff after his return from Europe "was off his mind."

Plaintiff called three expert witnesses. Defendant called none. Dr. Quirmbach, Clinical Director of Agnew State Hospital who saw plaintiff for the first time at Agnew about June 8th (about fifteen days after the marriage), testified that plaintiff then had a paranoid psychosis, which could also be described as schizophrenia; that on June 8th he was not competent to understand the obligations of the marriage relation, nor to undertake any act of importance, and that his psychosis continued from November, 1953. When asked his opinion concerning plaintiff's competency on May 24th to comprehend the duties and responsibilities of marriage he stated that plaintiff could not do so, basing his reasoning on the fact that plaintiff "was markedly psychotic and delusioned, and a delusional mental illness such as this colors a man's or person's whole actions and activity and thinking. So that whatever he does is in some way touched by it when an illness becomes as marked as this, and so that he isn't really competent to make decisions as a rational person, rather is influenced by the false ideas that he has," and further that plaintiff entered into the marriage "as a kind of a device to ward off the troubles that were conflicting him at the time and bothering him," and that his "delusional ideas so affected his relationship with the woman that he did not understand what he was entering into."

Dr. Wilbur (apparently a medical practitioner) who knew plaintiff since sometime in the 1930's, saw plaintiff at his office on May 22d (two days before the marriage), and testified that the day before plaintiff called him from Los Angeles and said he had a cut on his elbow which he had received in Los Angeles and which he wanted the witness to fix. When asked how he got the cut plaintiff said the witness knew all about it, as the witness was there when it happened. (This was not true.) Plaintiff admitted that he had voluntarily cut himself. The cut was 1¾ inches long directly over an artery. The witness sent plaintiff to Dr. Johnston. Plaintiff had put needles in each of his own toes and told Dr. Wilbur that he was sure that when the doctor had repaired plaintiff's bunions the preceding February, the doctor had put radio receiving sets in each of his toes, so that the cops could keep track of plaintiff. Dr. Wilbur further testified that plaintiff was of unsound mind on May 22d, and was unable to understand the nature and responsibilities of marriage and even simpler relationships than that.

Dr. Johnston, the psychiatrist to whom Dr. Wilbur referred plaintiff, saw him on May 26th (two days after the marriage). Plaintiff told him that on the boat returning from Europe he first noticed that people were trying to communicate with him over television and through the receiving sets which Dr. Wilbur had put in his toes. Plaintiff told him about other delusional activities on the boat. Plaintiff's ability to do abstract thinking was greatly impaired. His condition was "paranoid schizophrenic reaction of a severe type." He did not have sufficient mental capacity to understand the duties and responsibilities of marriage. While plaintiff indicated that he had previously been married and divorced he did not tell the witness of his marriage two days before. Asked on cross-examination if the witness knew that at the time of the wedding and for a couple of weeks thereafter plaintiff had given no intimation of mental disturbance, the witness would change his opinion, he replied that he would not.

Mrs. Carey, a witness for defendant, testified that before he went to Europe plaintiff stated that he would like to marry defendant, and on his return stated that he liked her as much as ever.

Mr. Cavitt, an insurance broker, tax consultant and accountant, knew plaintiff since 1948, and prepared his income tax returns for 1952 and 1953 from data given by plaintiff. The witness listed plumbing labor performed by plaintiff for

others from October 26th to December 20, 1953, and collections made by plaintiff for the years 1953 and early 1954. The witness testified that up to as late as February, 1954, plaintiff clearly and concisely discussed his business affairs and showed no lack of understanding them. About two weeks before plaintiff's marriage plaintiff told the witness he expected to get married and he thought he had a girl who would accept him. There was nothing abnormal about the discussion. Four or five days after the marriage plaintiff came in to report a fire in his automobile. He stated that he thought it was started by a cigarette which had blown through the back window. The morning plaintiff went to Agnew he gave the witness separate bills for the damage to his car and seemed to understand the matter. He was always lucid and clear in his understanding of business matters. In the witness' opinion plaintiff had a proper understanding of marriage.

Mr. Walker, a business man, met plaintiff shortly after the marriage. His conversation was rational and normal. A fire started in a cushion and plaintiff helped put it out, acting calmly and rationally.

One Page knew plaintiff and saw him frequently after his return from Europe. He acted normally and did not mention receivers in his feet.

Defendant testified to her acquaintanceship with plaintiff, his courtship and the circumstances of the marriage and to the lack of any abnormality in his actions at any time. The Reno taxi driver who was a witness to the wedding, and who drove them from the Reno airport to Minden where the marriage took place and then back to Reno, noticed nothing unusual in plaintiff's manner, conversation or answers to the justice of the peace, nor did he appear nervous or upset. The justice of the peace who performed the ceremony and his wife, the other witness to it, saw nothing unusual in plaintiff's actions.

While defendant's evidence created a conflict with that of plaintiff's witnesses which would have supported a finding that plaintiff at the time of the marriage was of sound mind, it does not compel such a finding. The finding of the jury that he was then of unsound mind is a reasonable one and supported by substantial evidence. Defendant seems to contend that because no witness for plaintiff testified to seeing plaintiff on the exact day of the wedding, and witnesses for defendant did, there is no evidence of unsoundness of mind on that day. While it is plaintiff's mental condition on that day that

is in issue, that condition may be determined from his condition prior and subsequent to the day. (See *Estate of Perkins,* 195 Cal. 699, 703 [235 P. 45].) The situation here is somewhat similar to that in *Williams* v. *Williams* (1923), 63 Cal.App. 482 [218 P. 783], where the court upheld a judgment annulling a marriage even though no witnesses for the successful plaintiff saw him on the day of the marriage. The language of the court is particularly applicable here (p. 486): ''The plaintiff called four doctors who qualified as experts and testified in substance that their examination indicated that the patient was suffering from dementia praecox, that his condition was such that their opinion was that at the time of his marriage it would have been impossible for him to have appreciated the solemnity of the marriage vows, as his judgment would have been too impaired for him to understand the nature, obligations, and responsibilities of marriage. We do not deem it necessary to go further into the testimony of the experts. Suffice to say that *their conclusion, uncontradicted by any medical expert, was that Williams must have been insane at the time of his marriage.* This testimony is in harmony with the conclusions already given in the testimony of the plaintiff's lay witnesses.'' (Emphasis added.)

As said in *Dunphy* v. *Dunphy,* 161 Cal. 380, 385 [119 P. 512, Ann.Cas. 1913B 1230, 38 L.R.A.N.S. 818], the law permits intimate acquaintances to give their opinions as to the mental sanity of a person and therefore, some weight ''may be attributed to the opinion, over and above that which would follow, as matter of necessary inference, from the reasons assigned.'' As to the opinion of the three medical witnesses, ''Expert witnesses may give their opinions concerning the mental condition of a person. They are not restricted to the mere declaration of an opinion that the person is or is not of sound mind, but may state the nature and extent of the deficiencies, if any, which they believe to exist.'' (*Estate of Schulmeyer,* 171 Cal. 340, 346 [153 P. 233].) Defendant characterized the opinions of the medical men as mere ''abstract opinions'' and hence not sufficient to support the finding of mental illness. They are not such. They are opinions based upon an examination of the subject, within a few days of the marriage. One doctor saw plaintiff two days before the marriage, the second saw him two days after, and the third fifteen days after. They were not giving their

opinions based upon hypothetical questions,* but from an actual observation of plaintiff himself.

Defendant quotes from the Dunphy case, ''The mental defect or derangement must be one having a direct bearing upon the particular act which is brought in question,'' (p. 383), and then contends that plaintiff's delusions and hallucinations did not have a direct bearing upon the act of getting married. However, the delusions and hallucinations were merely parts of the mental defect or derangement. It was his whole mental condition, those matters included, which caused plaintiff to have the inability to comprehend the act of marriage.

The judgment is affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

---

*However, such opinions may be considered in this type of case. See *Dunphy* v. *Dunphy, supra,* 161 Cal. 380, 386.