[L. A. No. 24145. In Bank. Mar. 22, 1957.]

Estate of WILLINORE M. FOSSELMAN, Deceased. HARRIET PALMER, Appellant, v. CHARLES F. SALKELD, as Executor, etc. et al., Respondents.

George R. McClenahan for Appellant.

Luce, Forward, Kunzel & Scripps and Edgar A. Luce for Respondents.

TRAYNOR, J.—Harriet Palmer filed a petition for probate of two holographic documents claimed to be codicils to the last will and testament of Willinore M. Fosselman. One reads:

"I give and bequeath to my friend, Harriet Palmer, the sum of ten thousand 10,000 June 17th 1953 to be paid to her after my death (death).

> Willinore M. Fosselman
> 4656 - 49th St.
> San Diego, Cal."

The other reads:

> "Jan. 12th, 1955

"When I die, I want this house to be given to Mrs. Harriet Palmer for her to live in if she chooses.

> Willinore Fosselman
> 4656 - 49th St."

Charles F. Salkeld, as executor, and Adele Marsh Rowe, residuary legatee under the will, contested the admission of these documents to probate on the ground that Mrs. Fosselman lacked the mental capacity to make a valid codicil at the times she executed them.

After a trial without a jury the court found:

". . . that at the time said two purported codicils . . . were written, dated and signed, and continuously up to the death of said decedent, she was suffering from senile dementia and was of such mental incompetency as to render her incapable of executing a Will, and was suffering from an insane delusion to the effect that Harriet Palmer was an old family retainer

who had been in her family many years previously, and was a very old friend; and that in fact the said decedent actually had known the said Harriet Palmer as an employee of only a few months standing when the said delusion became fixed, which said delusion was the effective cause of the execution of said instruments and which instruments would not have been executed by the said testator were it not for the said insane delusion.'' (Finding VII.)

''. . . that at the time of the execution of each of said instruments and continuously up to the time of her death the said decedent was mentally incompetent to execute a Will or codicil and had not sufficient mental capacity to be able to understand the nature of the acts she was doing nor to understand and recollect the nature and situation of her property or her relation to the persons who had claims upon her bounty. . . .'' (Finding VIII.)

Accordingly, the court entered judgment denying the admission of the two documents to probate. Petitioner appeals on the ground that the findings of the trial court are not supported by substantial evidence.

Prior to April, 1950, Mrs. Fosselman resided in New York City. She maintained with the Bankers Trust Company a securities-custodian account, which at the time of her death was of the approximate value of $460,000. The account was under the supervision of Charles F. Salkeld, a vice-president of the company, upon whom she came to rely for personal and business advice. In New York, Mrs. Fosselman was considered to be intelligent and quite alert for her age.

In April, 1950, Mrs. Fosselman moved to San Diego, California, intending to make her home there. Shortly after her arrival in San Diego, she tripped and fell in a hotel lobby and suffered a broken hip. She was treated by Dr. R. L. Hippen and removed to Mercy Hospital, where she remained for about seven weeks. While in the hospital she executed a will disposing of her entire estate and appointing Mr. Salkeld executor. At about the same time she asked Mr. Salkeld and Ralph Bullock, her New York attorney, to take charge of her financial affairs, and to that end she gave Mr. Bullock a general power of attorney. Edgar A. Luce was appointed her local attorney and charged with the management of her affairs in San Diego. Thereafter all bills were presented to Mr. Luce, who transmitted them to New York for payment. A small checking account, the balance not to exceed $500, was established in Mrs. Fosselman's name in a San Diego bank.

Mrs. Fosselman drew checks on that account for miscellaneous items until shortly before her death. On several occasions Mr. Bullock thought it advisable to obtain Mrs. Fosselman's consent to the transfer of funds or securities, and for that purpose Mr. Luce obtained Mrs. Fosselman's signature.

Upon her release from the hospital, Mrs. Fosselman was moved to a house, purchased with her funds, at 4656 49th Street in San Diego. She was attended throughout the day and night by three nurses working in shifts of eight hours each. A chauffeur was employed to take her on afternoon drives. Dr. Hippen remained her physician and visited her occasionally. Mr. Luce visited her on the average of once a week.

Petitioner was one of the nurses employed to care for Mrs. Fosselman. She had served originally as a relief nurse, but upon the death of one of the regular nurses in 1952, she was employed to attend Mrs. Fosselman regularly during the hours from 7 a. m. to 3 p. m., and she served in that capacity until Mrs. Fosselman's death. It is undisputed that Mrs. Fosselman appeared to be fond of petitioner. It is also undisputed that Mrs. Fosselman appeared to be equally fond of the other nurses.

Mrs. Fosselman died on March 25, 1955, at the age of 88 years. She was the last survivor of a family of 10 children and left as surviving relatives only nieces and nephews.

The purported codicil dated June 17, 1953, was first discovered after Mrs. Fosselman's death. Petitioner testified that she had been requested to clean out Mrs. Fosselman's desk and that in doing so she found a sealed envelope wrapped in tissue. The purported codicil was in the envelope. Petitioner testified that she had no knowledge of it before that time.

The purported codicil dated January 12, 1955, was delivered to petitioner by Mrs. Fosselman during her lifetime. Petitioner testified that on January 12, 1955, Mrs. Fosselman stated that there was something she wanted to do before she forgot it and that Mrs. Fosselman handed her a piece of paper, stating, ''Here, honey, you read this.'' Petitioner read it and replied, ''Well, you don't have to do anything for me,'' and Mrs. Fosselman said, ''Well, I know it. Do you think it is all right?'' Petitioner replied, ''Yes, it is.'' Mrs. Fosselman then stated, ''Now, if you don't think this is all right, you take it to a lawyer and have it checked.'' Mrs. Fosselman then took the paper to the living room and later returned and handed petitioner a sealed envelope, stating,

"Now, you are not to open this until after I die or pass away." She opened the envelope after Mrs. Fosselman's death and found that it contained the paper that Mrs. Fosselman had shown her.

Petitioner testified that on January 12, 1955, Mrs. Fosselman seemed to be aware of what she was doing, that her conversations were logical and reasonable, and that there was nothing in her conduct that would suggest that she was insane. "She was just like she had always been." With respect to Mrs. Fosselman's mental condition on June 17, 1953, petitioner gave her opinion that Mrs. Fosselman was not insane, that in the middle of 1953, Mrs. Fosselman seemed to be aware of what was going on in the world, who her relatives were, and that she had some property. Petitioner admitted that Mrs. Fosselman thought that she had known petitioner in Kansas City as an employee of Mrs. Fosselman's mother and that they were old friends; that when petitioner would correct her and explain that such was not the case, Mrs. Fosselman would say, "Now, that's right," but would subsequently reassert that she had known petitioner in Kansas City; that Mrs. Fosselman sometimes thought she was in New York; that she sometimes did not know that she owned the 49th Street house, but thought that she rented it from a landlord who was demanding an increase in rent; that she often felt that she did not have sufficient money to pay the household help; that she repeated herself constantly; and that Mrs. Fosselman insisted that the nurse who died in 1952 had stolen some chairs that in fact had been given away by Mrs. Fosselman in New York. Petitioner did not think that this behavior was illogical or irrational. She testified that she would not consider a person insane unless he was totally unconscious of his environment.

Several women who were neighbors of Mrs. Fosselman and who had visited her occasionally during the last five years of her life testified that she was able to converse with them about simple domestic matters and that she was not insane.

Mr. Salkeld visited Mrs. Fosselman five times during the last five years of her life. He testified that her mental condition started deteriorating in October, 1950, and that from that time until her death she became progressively confused. He testified that she remembered old events but nothing recent; that at times she thought she was in New York; that she constantly thought she did not have enough money and that when he tried to explain her property to her, she could not

"absorb it"; that she thought she had once owned a house in New York and wondered what had become of it, although she had never owned a house there; that she referred to her deceased brothers as being alive; and that on his last visit in March, 1954, he went to see her on the afternoon of one day and the morning of the next day, but Mrs. Fosselman was unable to recognize him. It was his opinion that from the fall of 1952 until the time of her death Mrs. Fosselman was unable to comprehend the nature and extent of her property or her relation to those who would be the natural objects of her bounty.

Mr. Luce recounted in detail his weekly visits with Mrs. Fosselman. He testified that except for one occasion, on January 31, 1951, Mrs. Fosselman was unable to converse intelligently with him about her property or business affairs; that she could not tell him about her accident in the hotel; that she could not understand the settlement that was made with the hotel's insurer; that despite his repeated explanations, she could not understand the source of the money that was being used to pay the nurses and household expenses; that she referred to some deceased members of her family as being alive and thought that others were dead, who in fact were alive; that she persistently claimed that petitioner had worked for her mother in Kansas City and was an old friend despite repeated explanations that petitioner was not even born at the time referred to. Mr. Luce gave his opinion that from 1952 until the time of her death Mrs. Fosselman was unable to comprehend the nature and extent of her property or her relation to those who would have a natural claim upon her bounty.

Dr. Hippen testified that Mrs. Fosselman was unable to comprehend what was going on around her; that she was never "completely associated about time"; that she frequently thought she was in New York City; that she did not "associate" the persons around her "as being nurses" and "never did quite comprehend who they were or what they were and she frequently got them mixed up with people she had known in the past"; that she thought she was destitute and frequently expressed the fear that she would be unable to pay his bill; that from 1952 on she was suffering from senile dementia, a generalized softening of the brain owing to impaired blood supply, and that in his opinion, Mrs. Fosselman, from 1952 until the time of her death, was unable to comprehend the nature and extent of her property or her relation to those who would be the natural objects of her bounty.

Lola R. Stephens, one of the nurses attending Mrs. Fosselman, testified that Mrs. Fosselman had stated many times that petitioner worked for Mrs. Fosselman's mother, although Mrs. Stephens repeatedly corrected her; that Mrs. Fosselman could not understand any reading; that she was confused as to where she was; and that she thought that her brothers would pay her bills, although her brothers were dead.

Mortimer Lumpkin, Mrs. Fosselman's chauffeur, testified that Mrs. Fosselman thought that she had known petitioner in Kansas City and that she often thought she was in New York.

Dr. Carl Lengyel, a psychiatrist to whose qualification counsel stipulated, in answer to a long hypothetical question based upon the evidence, stated his opinion that from 1952 until the time of her death Mrs. Fosselman was suffering from brain disease, probably arteriosclerosis, and was of unsound mind, and that during that period she could not comprehend the nature or extent of her property or her relation to those who would be the natural objects of her bounty.

### The Finding of General Testamentary Incompetency Is Supported by the Evidence.

Relying on the well established rule that successfully to contest a will on the ground of lack of capacity a contestant must prove testamentary incompetency at the time of execution of the will (*Estate of Lingenfelter*, 38 Cal.2d 571, 580 [241 P.2d 990]; *Estate of Perkins*, 195 Cal. 699, 703 [235 P. 45]), petitioner contends that the finding that Mrs. Fosselman lacked testamentary capacity at the times she executed the purported codicils is not supported by the evidence. Petitioner points out that none of the witnesses for contestants testified as to Mrs. Fosselman's mental condition on June 17, 1953 and January 12, 1955, the days on which she executed the purported codicils. She urges that the only evidence of Mrs. Fosselman's mental condition on June 17, 1953 is the purported codicil itself and that it discloses no incompetency, and that the only evidence of Mrs. Fosselman's mental condition on January 12, 1955 is the testimony of petitioner and the purported codicil itself and that this evidence tends to show that Mrs. Fosselman had testamentary capacity.

Testamentary incompetency on a given day, however, may be proved by evidence of incompetency at times prior to and after the day in question. (*Estate of Perkins, supra,* 195 Cal. at 703; *Estate of Lingenfelter, supra,* 38 Cal.2d at 580; see *Vitale* v. *Vitale,* 147 Cal.App.2d 665, 669-670 [305 P.2d

690].) Once it is shown that testamentary incompetency exists and that it is caused by a mental disorder of a general and continuous nature, the inference is reasonable (see *Estate of Baker*, 176 Cal. 430, 437-438 [168 P. 881]; *Vitale* v. *Vitale, supra*), perhaps there is even a legal presumption (Code Civ. Proc., § 1963, subd. 32; see *Estate of Schwartz*, 67 Cal.App.2d 512, 521, 522 [155 P.2d 76]; *Byrne* v. *Fulkerson*, 254 Mo. 97, 123 [162 S.W. 171]; *Bever* v. *Spangler*, 93 Iowa 576, 601 [61 N.W. 1072]) that the incompetency continues to exist. Such an inference is particularly strong in a case such as this in which the decedent was suffering from senile dementia, a mental disorder that becomes progressively worse. (*Byrne* v. *Fulkerson, supra*, 254 Mo. at 121-122, 123; *Bever* v. *Spangler, supra*, 93 Iowa at 597.) "Senile dementia begins gradually, is progressive in character and in its advanced stages 'the brain is well-nigh stripped of its functions.' The difficulty lies in determining the point at which in its progress it has so impaired the faculties that they fall below the mark of legal capacity. . . ." (*Byrne* v. *Fulkerson, supra*, 254 Mo. at 121; see Page on Wills, Lifetime ed., vol. 1, p. 284, § 138.) In the testimony of Mr. Salkeld, Mr. Luce, Dr. Hippen, and Dr. Lengyel there is an abundance of evidence from which the trial court could reasonably conclude that from 1952 until the time of her death Mrs. Fosselman was suffering from senile dementia in an advanced stage and that she could not comprehend the extent and character of her property or her relation to those who would be the natural objects of her bounty. Petitioner's testimony, the purported codicils themselves, and the fact that Mrs. Fosselman drew checks on a small account established in her name and that on several occasions Mr. Bullock thought it advisable to obtain her consent to the transfer of funds or securities constitute evidence that conflicts with the evidence presented by contestants. The trial court resolved that conflict and found that the decedent was incompetent. We cannot say as a matter of law that the finding was unreasonable.

*The Finding that the Decedent Was Suffering from an Insane Delusion as to Petitioner's Identity is Supported by the Evidence.*

 The evidence supporting the finding of an insane delusion is even stronger than the evidence supporting the finding of general incompetence. There is abundant evidence that Mrs. Fosselman persistently claimed that petitioner was

an old friend who had worked for Mrs. Fosselman's mother in Kansas City despite repeated explanations to the contrary. Petitioner herself testified that Mrs. Fosselman entertained that belief. The only evidence that Mrs. Fosselman was ever able to rid herself of this delusion is petitioner's testimony that when petitioner would explain to Mrs. Fosselman that she was mistaken, Mrs. Fosselman would say, "Now, that's right." Petitioner admits, however, that shortly thereafter Mrs. Fosselman would reassert her unfounded belief.

*The Finding that the Insane Delusion Was the Effective Cause of the Execution of the Purported Codicils Is Supported by the Evidence.*

■ The burden was upon contestants to prove not only that Mrs. Fosselman was suffering from the insane delusion but that that delusion "bore directly upon and influenced the creation and terms" of the purported codicils. (*Estate of Perkins, supra,* 195 Cal. at 704.) ■ Petitioner points to the uncontradicted testimony that Mrs. Fosselman was fond of petitioner and contends that it could be inferred therefrom that the purported codicils were the result of that affection and not the insane delusion. The court found, however, that the purported codicils were the result of the insane delusion, and that conclusion too is reasonably inferable from the evidence. Although it is undisputed that Mrs. Fosselman was fond of petitioner, it is also undisputed that she was equally fond of the other nurses. It may have been significant to the trial court that no bequests were made to any of the other nurses. We cannot say as a matter of law that the trial court could not find the facts as it did.

The judgment is affirmed.

Gibson, C. J., Spence, J., and McComb, J., concurred.

Shenk, J., and Schauer, J., concurred in the judgment.

CARTER, J.—I concur in the judgment of affirmance, but I cannot refrain from commenting upon the gracious declaration in the majority opinion, after narrating the overwhelming evidence in support of the finding of the trial court on the issue of testamentary incompetency of the testatrix, that: "We cannot say as a matter of law that the finding was *unreasonable.*" How any finding of fact based upon sufficient competent evidence could be anything but *"reasonable"* is beyond my comprehension. But for a majority of this court to uphold

a finding of testamentary incompetency or undue influence in a will contest is such an unusual event that it can only be characterized by unusual language. The majority opinion also states: "Once it is shown that testamentary incompetency exists and that it is caused by a mental disorder of a general and continuous nature, the inference is *reasonable* [citations] . . . that the incompetency continues to exist." It is not my understanding that the reasonableness of an inference or a conclusion reached by a trier of fact on sufficient competent evidence is for this court to determine. On the other hand, when the claim is made that the evidence is insufficient to support the finding of the trier of fact, the function of this court is limited to a determination of whether there is any substantial evidence, including inferences or presumptions which may arise from proven facts, to support the conclusion reached, and when a trier of fact has resolved an issue of fact, its determination is binding upon an appellate court unless the evidence against such determination is such that reasonable minds could come to no other but a contrary conclusion than that reached by the trier of fact. In this process the reasonableness of the inferences to be drawn from the proven facts is for the trier of fact and not for an appellate court. The above quoted language from the majority opinion gives rise to a new concept of appellate court review of factual determinations by trial courts, which concept I assume will be invoked only in will contest cases when this court sees fit to affirm a determination by a trial court that a will is invalid because of the testamentary incompetency of the testator or was procured by the undue influence of the proponent of the will. As I have heretofore pointed out in my dissenting opinions (*Estate of Lingenfelter,* 38 Cal.2d 571 at page 588 [241 P.2d 990]; *Estate of Welch,* 43 Cal.2d 173 at page 181 [272 P.2d 512]; *Estate of Bullock,* 140 Cal.App. 2d 944, 950 [295 P.2d 954, 297 P.2d 633]; *Estate of Keeney,* 140 Cal.App.2d 688, 694 [295 P.2d 479, 297 P.2d 636]), that with one single exception (*Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]) the majority of this court has taken the position that the determination of the factual issues in a will contest is the function of this court and not of the trial court or jury, thus repealing, by judicial fiat, section 19 of article VI of the Constitution of California and section 371 of the Probate Code. While the decision in the case at bar may seem to be a departure from the policy heretofore followed, I am convinced that the same legal philosophy which I have denounced

in my dissents in the above cited cases still prevails and will be invoked in future cases involving will contests so long as this court remains as it is now constituted.

In my opinion the evidence of testamentary incompetency is no stronger in this case than it was in any of the cases which I have hereinbefore cited, which the majority of this court held, as a matter of law, was insufficient to invalidate the will involved in those cases, and while a correct conclusion is reached by the majority in the case at bar, the reasoning of the majority in arriving at such conclusion is out of harmony with the settled rule with respect to the function and power of an appellate court to review the determination of an issue of fact by a trial court.